FIRST DIVISION
DECEMBER 31, 2007

No. 1-05-3882

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 03CR 20903 |
| | ) | |
| JOSHUA DIXON, | ) | Honorable |
| | ) | Michael Toomin |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE ROBERT E. GORDON delivered the opinion of the court:

Defendant Joshua Dixon was found guilty after a jury trial of first-degree murder and related offenses, and sentenced to 65 years of imprisonment. On appeal, defendant claims that the State abused the grand jury process by using the grand jury to freeze the testimony of prospective witnesses and that the State improperly presented evidence and argument concerning gang activity. For the reasons stated below, we affirm.

BACKGROUND

Defendant and codefendant Meesiah Davis were charged in a multicount indictment for first-degree murder and related offenses. After simultaneous jury trials with separate juries, defendant was convicted and codefendant Davis was acquitted.

No. 1-05-3882

What follows is a short summary of the facts established by the State's evidence at trial: On July 16, 2003, at approximately 2 a.m., the victim, Nikolay Shedko, was driving a tractor trailer truck that was too tall to fit under a viaduct near the Rockwell Gardens Housing Project in Chicago. A group of 20 to 30 adults and teenagers from the project surrounded the truck. The crowd included defendant who was 15 years old at the time, codefendant Davis, and prosecution witnesses Anthony Hines, Jerome West, Ernest Catchings and Jason Munson. When the crowd opened the back of the truck and found nothing of value, defendant went to the front of the truck and climbed up the driver's side. The truck driver hit defendant in the face with a cellular telephone, knocking defendant down. After the crowd laughed, defendant asked codefendant Davis for a gun and defendant fired into the cab of the truck, killing the driver.

What follows is a short summary of the State's evidence: At trial, the prosecution called four witnesses who had been members of the crowd surrounding the victim's truck: Hines, West, Catchings and Munson. Of the four crowd witnesses, only Hines testified at trial without recanting. The State impeached the other three with their grand jury testimony and other prior statements. Also, the three impeached witnesses claimed either at or before trial that they were afraid of defendant's gang.

In addition to the crowd members, the prosecution's witnesses included: Sharonda Foy, defendant's girlfriend and mother of his child; Louise Foy, Sharonda's mother; and Detective Munoz, who testified as a gang expert and concerning the murder investigation. Sharonda recanted her grand jury testimony. Before the grand jury, she testified that, on July 16, 2003, she observed defendant bleeding from his eye and had heard him state that someone had hit him in the

2

face. At trial, Sharonda's mother, Louis Foy, corroborated the fact that defendant's face was

bleeding on July 16.

The following description of the witnesses' trial testimony is lengthy because, with the exception of Anthony Hines' and Louise Foy's unrecanted testimony, most of the State's evidence consisted of recantations and impeachments.

The prosecution's first witness, crowd member Anthony Hines, testified as follows. On July 16, 2003, at approximately 2 a.m., he was drinking gin with a friend on the first floor of the Rockwell Gardens housing project, where he lived. He was only on his first glass, when he saw 20 or 30 people running around the building. Hines went to the front of the building to see why they were running, when he saw "an 18 wheeler that couldn't – it couldn't fit under the viaduct." The truck had backed up and stopped in front of Hines' building. Hines then joined the crowd that was trying to open the back of the truck. The crowd included Jason Munson, who was Hines' "nephew by marriage," and defendant, whom Hines had known for a couple of years. Hines was known by the nickname of "Snoop."

Hines further testified that after defendant and another individual called "Ken-Ken" succeeded in opening the back of the truck, they discovered it was empty. Defendant stated, "[Expletive deleted] that, let's rob him." Defendant then went to the front of the truck, with the crowd following him, and climbed up the truck on the driver's side. The driver hit defendant in the face, knocking defendant down, and the crowd laughed. Then defendant said to someone in the crowd, "[H]and me that mother [expletive deleted] gun," and Hines saw someone give

3

defendant a gun. Defendant then fired four or five times into the cab of the truck. After the shooting, the defendant, Hines and the rest of the crowd dispersed. Eight days later, on July 24, Hines spoke with Detective Munoz. Hines claimed that he left the state because he felt threatened but he did not refer specifically to gang activity or membership.

Jerome West testified as follows. At first, West testified that on July 16, 2003, at approximately 2 a.m., he was on the eighth floor of a building in the housing project, when he looked out the window and observed a truck, but he never went near the truck. Then the prosecutor showed West a written statement, signed by West on July 25, 2003. West claimed he signed the statement because he was scared. West admitted that he had known the defendant three or four months prior to July 16, and that he also knew "Sa-Sa," whom West identified in court as codefendant Davis, and that he knew an individual named "Snoop.".

West then testified that he had told the prosecutor that he was scared for the safety of himself and his family, because a gang called the "Traveling Vice Lords" had put the word out on the street that if West testified in court, the gang would retaliate against West and his family. However, West denied knowing whether defendant was a member of the Traveling Vice Lords. When questioned about his grand jury testimony, West denied his prior testimony that defendant was a member of the gang or that West worked security for the Vice Lords. West did admit that the Vice Lords would "beat up" someone who testified against a member.

Then West testified that he had worked security for the Vice Lords "one time" and that he could receive a 'violation' for testifying against a member. Then West admitted that both defendant and codefendant were members of the Traveling Vice Lords. The witness also

4

admitted that his testimony before the grand jury was substantially the same as his written statement.

On cross-examination by defendant's counsel, West testified that he could neither read nor write, and that he was a cocaine user in July 2003, when the murder occurred. He stated that when he worked "security," he acted as a lookout in the housing project, warning cocaine sellers if the police were approaching. For his security work, he was paid sometimes in cash, and sometimes in cocaine. West reiterated that on the night of the murder, he was in the building and not near the truck, and that he signed the statement because he was scared of the police. West testified on cross-examination that he did not see defendant shoot anyone.

On cross-examination by codefendant Davis' counsel, West testified that he had stated in front of the grand jury that he did not see "Si-Si" (a.k.a. codefendant Davis) give a gun to defendant. On redirect, West admitted to testifying in front of the grand jury that defendant had said, "Si-Si, give me the gun."

After West testified, the prosecution called David Weiner, the assistant State's Attorney (ASA) who had transcribed West's statement on July 25, 2003. On July 25, Detective Munoz was also present in the interview room, with Weiner and West. Since West was not a suspect, Weiner did not inform West of his Miranda rights. Outside the presence of the police, Weiner asked West about the police's treatment of West, and West stated that he had been treated well. At the end of the interview, Weiner gave West two options for memorializing his statement: videotaping, or having Weiner write the statement down, with West then having the opportunity to make changes or corrections. West chose the handwritten option.

5

Weiner further testified that he read the statement aloud to West, so that West could make any corrections or changes; and West signed the bottom of each page after Weiner read it. When West wanted Weiner to make a correction or change, all three of them initialed it. West made a number of corrections. The prosecutor then offered the statement into evidence; and it was admitted, without objection from the defense. The witness then published the statement to the jury by reading it to them.

West's statement related the events of the murder, including the following facts. West was working security for the Traveling Vice Lords on the night of July 16, 2003, when he noticed a tractor trailer truck stop at the viaduct and start to back up. The truck made a beeping noise as it backed up, and a number of people started running toward the truck, including defendant and codefendant. The crowd opened the back of the truck, which was empty. Defendant climbed up the driver's side and then fell back. When defendant stood up, he was mad because people in the crowd laughed at him. Defendant then told codefendant to give him a gun, and West saw codefendant hand defendant the gun. Defendant then climbed up the driver's side and pointed the gun at the driver's side window. A voice from inside the truck started screaming, "[D]on't hurt me." Then West saw two flashes coming from the gun and heard two shots.

Next the prosecutor called Lisette Mojica, the Assistant State's attorney (ASA) who had presented West as a witness to the grand jury. The defendant's attorney objected to the admission of the grand jury transcript, stating only: "Judge, we object to the admission of the grand jury. The witness never denied going to the grand jury." After the trial court ruled the grand jury testimony admissible as prior inconsistent statements, the witness read the entire

testimony to the jury.

West's grand jury statement was substantially the same as the written statement. However, before the grand jury, West stated that although he heard defendant ask codefendant for the gun, West did not actually see codefendant hand a gun to defendant. Before the grand jury, West also testified that defendant was a member of the Traveling Vice Lords, the same gang for which West acted as a lookout. On redirect, ASA Mojica testified that immediately prior to testifying before the grand jury, West was visibly scared, "practically trembling." On recross, she testified that West stated he did not want to talk about everything because "these people were Vice Lords."

The next prosecution witness was Ernest Catchings, who testified as follows. At the time of trial, he was serving a six-year sentence for a drug conspiracy. On July 16, 2003, he lived in the Rockwell Gardens Housing Project and his nickname was "Ken-Ken." He testified that on July 16, 2003, at approximately 2 a.m., he was selling crack cocaine inside a building at the project, and he denied being outside. He denied seeing defendant, codefendant or a truck. He stated: "When I told you all the false statement, I was just scared ***." Catchings did admit to being a member of the Traveling Vice Lords.

Catchings further testified that on July 23, 2003, he told Detective Munoz that he was outside the building on July 16 with defendant, codefendant and others; that he saw a freight truck; and that he heard defendant say, "[L]et's go hit the truck." However, he denied having told Detective Munoz that defendant and codefendant ran toward the truck; that defendant opened the back of the truck; that the truck was empty; that defendant and codefendant ran to the

driver's side; that he heard gunshots; and that he saw defendant running with a gun in his hand and his hand over his eye. Catchings admitted viewing a lineup at a police station on July 25, 2003, but denied picking out defendant. Catchings also admitted to making a videotaped statement on July 25 in the presence of two assistant State's Attorneys and Detective Munoz , in the State's Attorney's office in a building on the corner of 26th and California. Catchings claimed that he gave the statement because Detective Munoz had threatened to charge him as an accessory to murder.

Codefendant's counsel objected to the videotape, only on the ground that the questions asked on the videotape were leading. Defendant's counsel voiced no objection. After the trial court overruled the objection, the prosecutor played the videotape in court, in front of the jury. Catchings admitted having been asked those questions and having given those answers, and identified the transcript of the videotape. Catchings also stated that Louise Foy was his aunt and that Louise's daughter Sharonda had a baby with defendant.

Catchings also admitted to testifying in front of the grand jury on July 25, 2003. Although he admitted to watching the videotaped statement while it played in front of the grand jury, he could not recall whether he swore in front of the grand jury that the statement was truthful. He now claimed the statement was false. Catchings claimed that he could not now recall any of his other answers in front of the grand jury.

Catchings denied telling Detective Munoz on October 28, 2003 that his mother received a telephone call that some boys were looking for him; that a man named "Tek-Wayne" called him at his aunt's house to ask why the police had him; or that at a funeral Timmy Walton and others had

called Catchings a "trick" or a turncoat. The prosecutor then had Catchings identify Timmy Walton as a person sitting in the audience of the courtroom. Catchings also denied having told Detective Munoz on October 28, 2003 that several weeks after the murder, four men had chased him. Catchings did recall speaking to the prosecutor on April 25, 2005, but denied telling the prosecutor that his grand jury testimony was truthful or that he was afraid to testify.

On cross-examination, Catchings denied having met the prosecutor before. Catchings also testified that on July 25, 2007, he was handcuffed to the wall of the police station, when Detective Munoz told him that the detective knew defendant was the gunman and that the detective wanted "the story." Catchings testified that, he kept telling Detective Munoz that he did not know anything. Catchings testified that he was scared of being charged as an accessory to murder.

Next the State called ASA Michael Rogers who met with Ernest Catchings on both July 24 and 25, 2003, and who conducted the videotaped interview on July 25. The videotaped interview occurred in the office of the state's attorney's office. Immediately after the videotaped interview, Rogers presented Catchings as a witness to the grand jury and played the videotape for the grand jury. The state then offered into evidence the grand jury transcript. Defendant's attorney objected on the ground that Catchings "was never confronted with the transcript when he was on the stand." The trial court received it into evidence, and Rogers read it to the jury.

Before the grand jury, Catchings testified that his videotaped statement was truthful, that he saw the defendant come running from around the truck after the shooting, that defendant was carrying a handgun, that codefendant was crying and asking defendant why defendant shot the driver when they could have just beat him up, that defendant told codefendant to shut up because

9

they were "acting like little ass bitches," and that defendant was holding his eye and saying that the driver hit his eye with a telephone.

Next, the State called ASA Paul Chevlin, who observed ASA McKay's interview of Catchings on April 25, 2005. Chevlin testified that on April 25, Catchings stated that his grand jury testimony and videotaped statement were truthful, that he was fearful of testifying against the defendants.

The next State witness was Sharonda Foy, the 17-year old mother of defendant's 2-year old son. Sharonda testified that she lived with her mother Louise Foy in the Rockwell Gardens Housing Project. However, she did not recall where she was at 2 a.m. on July 16, 2003. She testified that she could not recall either the events of July 16 or whether she had testified in front of the grand jury on August 25, 2003. She admitted that she knew codefendant Davis whom she called "Sa-Sa," and Ernest Catchings whom she knew as "Ken-Ken." On redirect, she also claimed that she did not remember whether on August 24, 2003, she was sitting in an automobile when a girl hit the auto with a golf club and Tek-Wayne said that the girl should bust Sharonda's head open because Sharonda was "tricking" on them.

The next witness was Louise Foy, Sharonda's mother, who testified as follows. She had known defendant for 11 of his 17 years. He was a member of the Traveling Vice Lords and the father of her two-year-old grandson. In the early morning hours of July 16, 2003, she was asleep in her apartment in the Rockwell Gardens Housing Project, when she was awakened by her daughter screaming that defendant was bleeding. She then saw defendant walking out of her bathroom, holding a bloody towel to the right side of his face. Approximately one or two weeks

prior to the murder, she had found bullets in her grandchild's hamper, and had stated that defendant was no longer welcome in her house. After defendant walked out of the bathroom, he and her daughter Sharonda left the apartment. Louise later told Detective Munoz the location of defendant and several witnesses. In return for this information, Louise received $300 and a promise to help her relocate.

Next, the State called ASA Michael Yoon, who testified about his presentation of Sharonda Foy to the grand jury twice on August 25, 2003. The first presentation concerned an assault on Sharonda on August 24, 2005, the day before her grand jury testimony; the second presentation concerned the events of July 16, 2003. After the trial court overruled defense objections, Yoon read the grand jury transcripts to the jury.

During the second grand jury presentation on August 25, 2003, Sharonda testified as follows. On July 16, 2003, at approximately 2 a.m., she was on her front porch in the Rockwell Gardens Housing Project with defendant and her cousin Shirley Brooks. Defendant then went downstairs to the basketball court, where codefendant, Ernest Catchings, Jason Munson and others were. After defendant left, she went back into her apartment. Later, defendant came running upstairs and asked her for a towel because someone hit him in the eye with a telephone. She could see that his eye was bleeding. Then defendant, Sharonda and their baby left in defendant's automobile and drove to the home defendant shared with his mother and siblings. Approximately a week later, Sharonda was present when defendant's mother Stephanie had a conversation with codefendant at defendant's home. Codefendant stated that he had broken the chain across the back of the truck

11

During the first grand jury presentation on August 25, 2005, Sharonda testified as follows: She was in an automobile on August 24, 2005, with her aunts Shirley and Felisha and her cousins Amesha and Tarita. They were driving out of a parking lot at the housing project, when a girl named Lavita Watkins walked up and hit the vehicle with a golf club. When they exited the vehicle, a boy named "Tech Wayne" said Lavita should bust their heads open because they were "tricking" or ratting on them. Another girl, Tamesha Jackson, threw a bottle at them. Another girl, Latonya Jefferson, maced Shirley, who had been in the auto. Another girl, Carla Momen, was also spraying mace but she did not hit anyone. Another girl, Latasha Jefferson, threw a bike at Amesha, who had also been in the auto. A boy named Chester was passing bottles and other stuff to the attackers to throw at Sharonda and her family.

Next the State called the evidence technicians and police officers who processed the crime scene. Then the State called Jason Munson, another member of the crowd, who testified as follows. At the time of the trial, Jason was in custody for drug possession. On July 16, 2003, he was 17 years old and living in the Rockwell Gardens Housing Project. At approximately 1:30 a.m., he was outside, when he saw a crowd of approximately 20 people coming from the basketball courts and heading towards the street. Munson denied seeing either defendant or codefendant in the crowd and denied being a gang member. He did admit to seeing his uncle, Anthony Hines. Munson then observed a truck trying to back up and making a beeping sound. After the crowd opened the back of the truck, Munson heard people in the crowd saying that the truck was empty. Munson was not sure if he heard gun shots. Then everyone, including Munson, ran.

Munson further testified that he remembered meeting with Detective Munoz on August 11, 2003. He denied having told Detective Munoz that he saw defendant, codefendant and Ernest Catchings on July 16; that defendant walked to the driver's side of the truck; that Munson pulled two little kids off the back of the truck; that he observed that the back of the truck was empty; that someone asked for "the heater"; that codefendant then walked toward the front of the truck; that someone then said "don't hurt me"; and that Munson heard three or four gun shots.

Munson further testified that on August 11, 2003, he recalled having testified before a grand jury. At trial, Munson made essentially the same admissions and denials with respect to his grand jury testimony that he had made with respect to his oral statement to Detective Munoz. At trial, Munson claimed that prior to his grand jury testimony, Detective Munoz threatened Munson with being charged as an accessory to murder. Munson also recalled meeting on May 5, 2005 with ASA Sexton and ASA Emily Cole. However, he denied having told them that his grand jury testimony was truthful or that he had belonged to a gang.

The State's next witness was ASA Dan Klapman, who presented Jason Munson to the grand jury on August 11, 2003. Overruling the defense objection, the trial court permitted Klapman to read the grand jury transcript of Munson's testimony to the jury.

On August 11, 2003, Munson testified in front of the grand jury as follows. On July 16, 2003, Munson was 16 years old and living in the Rockwell Gardens Housing Project. At approximately 1:30 a.m., he was outside when he observed a crowd of approximately 15 people running from the projects towards the street. The crowd included defendant, codefendant, Ernest Catchings, and two children, brothers Dantana and Lavel Buchanon. Munson then followed the

crowd to see what they were running toward, and he observed an 18-wheel truck. Dantana and Lavel were standing on the back of the truck, and the back doors of the truck's trailer were open. Munson ran to the back of the truck and pulled the little kids off it, observing that the trailer was empty. At this point, the truck was moving slowly backwards, because it was too tall to proceed under the viaduct.

In front of the grand jury, Munson further testified that his uncle, Anthony Hines, was trying to open the trailer door, as Munson was trying to close it. After Munson jumped off the back of the truck, codefendant was standing right next to Munson, on the driver's side of the truck. As soon as Munson heard someone say "who got the heater" and "who got the gun," Munson observed codefendant walk toward the front of the truck. Munson heard someone else say "don't hurt me, don't hurt me." After hearing three or four gunshots, Munson ran.

The next state witness was ASA Emily Cole, who was present during ASA Sexton's interview of Jason Munson on May 5, 2005. Cole reported that during the interview Munson stated that he was outside when a truck became stuck under a viaduct, that a crowd ran toward the truck with the intent of robbing it, that the Buchanon kids were on the back of the truck which was empty, that he heard gunshots and ran, and that he had previously belonged to a gang

Next police sergeant Gilberto Calderon testified that after he and other officers went to defendant's mother's house with the intention of arresting defendant, Calderon saw defendant jump out of a bathroom window, 10 feet off the ground. Defendant started running, and a detective tackled him. The next State witness, Officer Robinson of the Chicago police department, testified briefly concerning codefendant's arrest. The jury then heard a stipulation in

14

which the parties agreed to certain forensic information, including that: no identifiable finger prints were retrieved from the crime scene; and five bullets were retrieved from the crime scene and they were all fired from the same .38-caliber weapon.

Detective Munoz then testified concerning his interview of Ernest Catchings on July 23, 2003. Catchings told Munoz that on July 16, 2003 at approximately 2:30 a.m. he was outside at the Rockwell Gardens Housing project with defendant, codefendant and others, that a truck was backing up from the viaduct, that defendant said "[L]et's go hit that truck." that defendant opened the back of the truck only to discover that it was empty, that defendant and codefendant walked toward the driver's side, that Catchings heard three gunshots, that defendant ran with a handgun in his left hand and his right hand over his eye, and that codefendant was crying and asking defendant why he shot "that man."

Defendant's counsel objected on hearsay grounds to Munoz's testimony, and the trial court overruled the objection. Detective Munoz then testified that Catchings told him that defendant replied that "[H]e busted my mother *** eye open," that defendant placed the gun under his T-shirt, and that defendant accused codefendant and others of being "bitches." Catchings further told Munoz that on the morning after the murder, Catchings saw defendant at a store and defendant told Catchings that the "man" had hit defendant with a telephone. On July 25, 2003, Detective Munoz was present when Catchings picked defendant out of a lineup and when Ernest Catchings made a videotaped statement.

Detective Munoz also testified concerning his interview of Jason Munson on August 11, 2003. Munoz testified that Munson was not handcuffed during the interview. Munoz then

15

testified to the facts that Munson related during the interview, which were essentially the same facts as those related in Munson's grand jury testimony. Munson also told Munoz that approximately a week after the murder, a man named Dave Collins accused Munson and Anthony Hines of being snitches, and Collins and Hines fought.

Detective Munoz also testified that Ernest Catchings told him on October 28, 2003 that Tek-Wayne called to ask Catchings whether he was cooperating with the police. Catchings told Munoz that the telephone call made Catchings think that he was "going to get hurt." Catchings told Munoz that three weeks after the telephone call, Catchings went to a wake and was accused of being a snitch. Catchings was also chased from a food store by four men whom he had never seen before.

The State offered Detective Munoz as a gang expert. After defendant's trial counsel stipulated to his qualifications "subject to the court's ruling," the trial court ruled Munoz was an expert. Munoz testified that the Traveling Vice Lords, whose symbol was a five-pointed star, controlled a portion of the Rockwell Gardens Housing Project. Looking at a photograph of the defendant, Munoz identified defendant's five-pointed star tattoo as a gang tattoo. Munoz also identified gang tattoos present on codefendant's body. The photographs of the tattos were then published to the jury over defense objection. Munoz testified that a "violation" occurs when a gang member violates gang rules, such as by testifying against another gang member or by talking to the police. Munoz testified that defendant, codefendant and Ernest Catchings were all members of the Traveling Vice Lords.

After the State rested, defendant's trial counsel introduced a stipulation that the only

16

blood found on the victim's cellular telephone was the victim's blood. The defense did not present witnesses or any evidence in its case in chief.

After deliberating, the jury convicted defendant of first-degree murder, attempted armed robbery, vehicular invasion and burglary; and the trial court sentenced him to 65 years. On September 30, 2005, the trial court denied the defendant's motion for a new trial; and this appeal followed.

ANALYSIS

On appeal, defendant claims: (1) that the State abused the grand jury process by using the grand jury to freeze the testimony of prospective witnesses; (2) that the State improperly presented evidence concerning witness fears of gang retaliation; and (3) that the State improperly referred to the defendant's gang membership during closing argument. For the reasons discussed below, we affirm the conviction.

Defendant admits on appeal that he failed to include in his posttrial motion the claims regarding the grand jury and the prosecutor's closing argument. The Illinois Supreme Court has held that a "defendant must both specifically object at trial and raise the specific issue again in a posttrial motion to preserve an alleged error for review." People v. Woods, 214 Ill. 2d 455, 470 (2005); People v. Piatkowski, 225 Ill. 2d 551, 564 (2007). Since the defendant failed to raise these claims in a posttrial motion, this court will review them only for plain error.

When a defendant has failed to preserve an error for review, an appellate court may still review for plain error. "[T]he plain-error doctrine allows a reviewing court to consider an unpreserved error when (1) a clear or obvious error occurs and the evidence is so closely balanced

that the error alone threatens to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurs and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." Piatkowski, 225 Ill. 2d at 565; Woods, 214 Ill. 2d at 471.

Grand Jury

Defendant claims that the State's sole purpose in presenting Jerome West, Ernest Catchings, Jason Munson and Sharonda Foy as witnesses before the grand jury was to preserve their testimony in case they changed their story at trial. Defendant claims the State's purpose is evident from the fact that these witnesses were not presented either prior to defendant's arrest or in front of the grand jury that indicted defendant. Thus, defendant claims these witnesses were not presented for the purpose of either indicting defendant or determining probable cause for his arrest. People v. Rodgers, 92 Ill. 2d 283, 288 (1982) (grand jury's purpose is to determine whether proposed indictment is based on probable cause); In re May 1991 Will County Grand Jury, 152 Ill. 2d 381, 392 (1992) (grand jury's function includes establishing "the probable cause necessary for the arrest of suspected felons" ).

However, there is a flaw in defendant's argument. When the State sought an indictment of defendant, it presented one witness to the grand jury: Detective Munoz. Although Detective Munoz did not name particular witnesses, he provided a factual summary of the case based on witness statements and other aspects of the investigation. People v. Fassler, 153 Ill. 2d 49, 60 (1992) ("a valid indictment may be based entirely on hearsay"); Rodgers, 92 Ill. 2d at 286 (same).

18

Thus, defendant has failed to prove his claim that the witnesses' grand jury testimony was not used to support his indictment. Fassler, 153 Ill. 2d at 58 ( to dismiss indictment due to prosecutorial misconduct before the grand jury, defendant bears the burden of showing "actual and substantial prejudice" ); People v. DiVincenzo, 183 Ill. 2d 239, 256 (1998) ("defendant must make a showing of substantial injustice").

It is important to note what defendant is, and is not, claiming on appeal with respect to the grand jury. First, defendant does not claim that the trial court abused its discretion by admitting the grand jury statements at trial, pursuant to Section 115, 10.1 of the Code of Criminal Procedure of 1968 (725 ILCS 5/115-10.1 (West 2002)). Section 115-10.1 permits the introduction of prior inconsistent statements made under oath at a prior proceeding, such as at a grand jury hearing. Thus, the trial court's evidentiary ruling is not at issue before this court. Defendant claims error not by the trial court but by the prosecutors.

Second, although defendant claims that the prosecutors abused the grand jury process, he does not claim that their misconduct tainted the issuance of the indictment itself. People v. DiVincenzo, 183 Ill. 2d 239, 257 (1998) (for prosecutorial misconduct to warrant dismissal of the indictment, defendant must show that it affected grand jury deliberations). He does not claim that the indictment was obtained through fraud, coercion or lack of evidence. Di Vincenzo, 183 Ill. 2d at 257-58 (due process rights of a defendant may be violated if the prosecutor "intentionally misleads the grand jury" or applies "undue pressure or coercion"); Rodgers, 92 Ill. 2d at 290 (defendant may seek to quash an indictment unsupported by any evidence). Thus, defendant is not asking this court to quash the indictment or find it to be improper.

19

Third, defendant does not claim that the prosecutors called these four witnesses to the grand jury for the purpose of harassing or pressuring the defendant. Although one of the four witnesses, Sharonda Foy, is the defendant's girlfriend, defendant did not claim on appeal that the remaining three witnesses were close friends or family members, such that subpoenaing them could be seen as a means to harass the defendant.

Instead, defendant claims that prosecutors used the grand jury process for a purpose for which it was not intended, namely to preserve testimony. In essence, the defendant is claiming that the prosecutors obtained grand jury subpoenas with wrongful intent, and that this prosecutorial misconduct entitles him to a new trial. To support his claim of prosecutorial misconduct, he cites several statements by assistant State's Attorneys concerning their desire to preserve witness testimony.

To support his claim that the claimed misconduct entitles him to a new trial, the defendant relies primarily on the Illinois Supreme Court's holding in People v. Hayes, 139 Ill. 2d 89, 121 (1990), *overruled on other grounds*, People v. Tisdel, 201 Ill. 2d 210, 219 (2002) ("the Hayes court erred in limiting 'statements of identification' to a witness' actual identification of a defendant"). Like the defendant in the case at bar, the defendant in Hayes claimed that the State acted improperly by calling a witness with the sole purpose of preserving testimony for trial. The Illinois Supreme Court held that "the State acted improperly in calling a witness to testify before the grand jury after the indictment against the defendant was returned." Hayes, 139 Ill. 2d at 121 (Emphasis Added.)

However, the error in Hayes did not entitle the defendant to a new trial because he failed

to show any prejudice from the error. Hayes, 139 Ill. 2d at 121. Since the grand jury testimony of the improperly called witness was "substantially similar" to testimony already provided to the grand jury, the supreme court stated "we fail to see how the defendant was prejudiced." Hayes, 139 Ill. 2d at 121.

The defendant's reliance on Hayes is not persuasive. First, Hayes is distinguishable from the case at bar because the witnesses in the case at bar testified in front of a grand jury, before the indictment was returned. Ernest Catchings, testified in front of a grand jury on July 25, 2003; Jerome West, on August 5, 2003; Jason Munson, on August 11, 2003; and Sharonda Foy, on August 25, 2003. A grand jury returned an indictment on September 23, 2003. Thus, as discussed above, the defendant has failed to show that the witnesses' grand jury testimony did not contribute to the indictment.

Second, even if this court were to find misconduct, the defendant in the case at bar is not entitled to a new trial. Like the defendant in Hayes, he failed to show any prejudice from the claimed misconduct. There were four crowd witnesses who testified at trial: Hines; West; Catchings; and Munson. Hines testified without recanting. West and Catchings provided recorded, pretrial statements that were "substantially similar" to their grand jury statements. Hayes, 139 Ill. 2d at 121. Defendant did not challenge the admissibility of their recorded statements – not at trial, not in his posttrial motion, and not in this appeal. Since the prosecutors had almost duplicate statements in hand, it is hard to understand what prejudice the defendant suffered from West and Catchings' grand jury testimony. Sharonda Foy also testified in front of the grand jury, but she was not a crowd witness and provided only corroborative testimony.

21

Munson was a crowd witness but he did not see defendant shoot, making his testimony, like Sharonda's testimony, merely corroborative. Thus, like the defendant in Hayes, the defendant has failed to show prejudice.

In sum, the defendant is not entitled to a new trial due to claimed prosecutorial abuse of the grand jury process because: first, there was no error since the testimony of the grand jury witnesses could have contributed to the indictment; and second, the defendant has failed to show prejudice since one witness never recanted, two witnesses gave other "substantially similar" recorded statements, and two witness were merely corroborative. Hayes, 139 Ill. 2d at 121. Since there was no error, a plain error analysis is not necessary. People v. Johnson, 208 Ill. 2d 53, 64 (2004) ("Absent reversible error, there can be no plain error").

Witness Fears of Gang Retaliation

Defendant claims that the trial court erred by permitting evidence concerning the witnesses' fears of gang retaliation. Prior to trial, the State made a motion in limine to permit introduction of gang evidence to explain the recanting of trial witnesses. The trial court granted the motion with the proviso that the State could not make any reference before the jury to gang evidence until a trial witness actually recanted.

The Illinois Supreme Court has held that a trial court's "evidentiary rulings with respect to gang-related evidence are reviewed for abuse of discretion." Johnson, 208 Ill. 2d at 102; People v. Tolliver, 347 Ill. App. 3d 203, 222 (2004); People v. Barajas, 322 Ill. App. 3d 541, 556 (2001). Gang-related evidence may be "admitted so long as it is relevant to an issue in dispute and its probative value is not substantially outweighed by its prejudicial effect." Johnson, 208 Ill. 2d at

22

102. Gang-related evidence is probative if it explains a witness's motive to lie about the defendant's involvement in the offense. Johnson, 208 Ill. 2d at 103; see also Tolliver, 347 Ill. App. 3d at 221 (gang-related evidence is admissible "to provide a motive for an otherwise inexplicable act"). Thus, this court has previously held that a trial court did not abuse its discretion by admitting gang-related evidence, to explain why trial witnesses recanted their grand jury testimony and testified differently at trial. Tolliver, 347 Ill. App. 3d at 222. This court holds, as we previously did in Tolliver, that the trial court did not abuse its discretion by admitting gang-related evidence for the purpose of explaining the witnesses' change of heart at trial.

Defendant claims that, in order to admit evidence that fear of gang retaliation caused a witness to change his or her testimony, the State must first show evidence of: (1) the witness's membership in a gang; (2) an actual decision by the gang to intimidate this witness or the gang's practice to "always" intimidate testifying witnesses; and (3) the defendant's knowledge of the intimidation.

The defendant's claims are unpersuasive. First, the State does not have to prove that the witness belonged to a gang, because a gang may inspire fear in nonmembers as well as its own members. Second, the witness may have a legitimate fear of gang retaliation, whether or not the State can prove that the gang made an "actual" decision with respect to this specific witness or the gang failed to retaliate for every witness. The issue is not the gang's state of mind, but the witness' state of mind. Third, without the defendant's direct knowledge or active participation, the gang may cause a witness to lose heart when testifying for the first time in public.

In addition to being unpersuasive, defendant's first claim about gang membership is

23

factually incorrect. The State did present evidence of gang membership. Louise Foy testified at trial, without recanting, that defendant, whom she had known most of his life, was a member of the Traveling Vice Lords. Ernest Catchings, who recanted much of his grand jury testimony at trial, still admitted at trial that he was a member of the Traveling Vice Lords. Jerome West, who also recanted at trial, still admitted at trial that he had worked for the Vice Lords. Thus the State did present evidence of gang membership or activity with respect to defendant and two of the recanting witnesses.

In addition to being unpersuasive and factually incorrect, defendant's claims run counter to this court's precedent. In Tolliver, this court held that the trial court had properly admitted evidence of gang intimidation against witness Lacole Dismuke even though there was no evidence of: (1) this witness' membership in a gang; (2) an actual decision by the gang to intimidate this witness (other than the actual act of intimidation) or the gang's practice to "always" intimidate testifying witnesses; or (3) the defendant's knowledge of the intimidation. Tolliver, 347 Ill. App. at 209, 212-13, 222.

In sum, the trial court did not abuse its discretion in admitting gang evidence for the purpose of explaining why trial witnesses recanted their grand jury testimony and prior statements; and defendant's objections to this evidence had no merit.

Prosecutor's Closing Argument

Defendant claims that the prosecutor committed misconduct by discussing the defendant's gang membership in closing argument. A prosecutor has wide latitude during closing argument; and a trial court has discretion over the style and substance of closing argument. Tolliver, 347 Ill.

App. 3d at 224. An appellate court will not reverse, absent an abuse of that discretion. Tolliver, 347 Ill. App. 3d at 224. When reviewing claims of prosecutorial misconduct in closing argument, a reviewing court will consider the entire closing arguments of both the prosecutor and the defense attorney, in order to place the remarks in context. Tolliver, 347 Ill. App. 3d at 224. A prosecutor may make arguments based on the evidence and on any reasonable inferences that may be drawn from the evidence, even if the inferences are unfavorable to the defense. Tolliver, 347 Ill. App. 3d at 224-25.

Defendant admits in his brief to this court: that he failed to object to these comments at trial; that his counsel was not ineffective; and that "no legitimate argument exists that on this record the outcome of the trial would have been different absent these remarks."

Defendant claims on appeal that the prosecutor's remarks merely "contributed" to his not receiving a fair trial. Defendant claims that he did not receive a fair trial due to the "cumulative effect" of the prosecutor's remarks, combined with the abuse of the grand jury process and the admission of the gang evidence. Johnson, 208 Ill. 2d at 64 ("cumulative effect of errors" may warrant reversal). However, since this court has already found there was no error with respect to the grand jury process or the admission of the gang evidence, there is no cumulative effect to consider. Thus, this court will consider whether the remarks alone created the kind of "substantial prejudice" that warrants a new trial. Johnson, 208 Ill. 2d at 64 (reversal required if prosecutor's closing remarks resulted in "substantial prejudice"); People v. Easley, 148 Ill. 2d 281, 332 (1992) ("The remarks by the prosecutor, while improper, do not amount to substantial prejudice").

As the defendant admitted in his brief to this court, these remarks by themselves were

harmless. It is true, as defendant claimed on appeal, that the prosecutor referred repeatedly to defendant's gang membership during his closing argument. However, defendant's trial counsel then used defendant's gang membership during his own closing argument to support his own theory of the case: namely, that the defendant was "served up by the other gang members to the police." Defendant's counsel argued to the jury that:

> "Big fish use the little fish. Traveling Vice Lord, traveling varmints
>
> and mice, terribly vicious liars, whatever you want to call them,
>
> make their money through narcotics. When you're in the business
>
> of selling narcotics, sometimes you have assets, sometimes you
>
> have liabilities. When their narcotics ring was shut down after this
>
> shooting, he [defendant] became a liability. He was served up to
>
> the police. The police were told who to talk to."

Defendant's trial counsel argued that defendant was a "little fish" in the Vice Lords gang:

> "When he was 15, do you really think he was the ring leader of [*sic*]
>
> a selling of narcotics over at Rockwell Gardens? If you do, then
>
> convict him right now and I will sit down."

Toward the end of his closing argument, defendant's counsel asked the jury:

> "Do not allow yourselves to be used by Timmy and Chester and the
>
> rest of his friends who want to keep their drug operation going by
>
> serving up this kid."

The defense attorney did not object at trial to the prosecutor's repeated references to defendant's

membership in the Vice Lords because the references supported the defense's "big fish eat little fish" theory of the case.

This court is well aware that our supreme court held that a prosecutor acted "improper[ly]" in closing argument when he characterized the defendant as "evil " and as an "animal" acting in a "pack.." <u>Johnson</u>, 208 Ill. 2d at 80. However, it is hard for this court to condemn the prosecutor's repeated references to defendant's Vice Lord membership and its pack mentality, when defendant's own counsel made repeated references to the Vice Lords as "vultures." Defendant's attorney outdid the prosecutor in condemning the Vice Lords when he argued to the jury:

> "[T] he Traveling Vice Lords *** sell drugs. They sell poison.
>
> They kill our children. They kill their own children."

In sum, this court cannot find that the prosecutor's remarks about defendant's gang membership to be prejudicial. where defense counsel used the same type of remarks in his own closing argument to support the defense theory of the case. As defendant admitted in his brief to this court, the prosecutor's remarks by themselves were harmless.

CONCLUSION

For the foregoing reasons, the conviction is affirmed. In sum, the defendant is not entitled to a new trial due to abuse of the grand jury process because, first, defendant failed to show that the testimony of grand jury witnesses did not contribute to the indictment and, second, he failed to show prejudice where two of the recanting witnesses gave substantially similar, recorded statements and two of the recanting witnesses were merely corroborative. The defendant is also

not entitled to a new trial due to gang evidence admitted to explain why trial witnesses recanted their prior statements. Finally, defendant is not entitled to a new trial due to the prosecutor's remarks in closing concerning gangs where, as defendant admits on appeal, the remarks by themselves were harmless.

Affirmed.

CAHILL, P.J., and GARCIA, J., concur.