47 A.3d 635

**Shelton BURRIS a/k/a Tyrone Burris**

v.

**STATE of Maryland.**

**No. 1970, Sept. Term, 2010.**

Court of Special Appeals of Maryland.

June 28, 2012.

Allison M. Sayers (Paul B. DeWolfe, Public Defender, on the brief) Baltimore, MD, for appellant.

Cathleen C. Brockmeyer (Douglas F. Gansler, Atty. Gen., on the brief) Baltimore, MD, for appellee.

Panel: KEHOE, WATTS and JAMES P. SALMON, (Retired, Specially Assigned), JJ.

WATTS, J.

Following a trial held from July 20, 2010, through July 23, 2010, a jury sitting in the Circuit Court for Baltimore City convicted Shelton Burris, also known as Tyrone Burris, appellant, of one count of first-degree murder and one count of use of a handgun in the commission of a crime of violence.[1] *See*

---

1. The State did not submit the charge of wearing, carrying, or transporting a handgun to the jury.

Md.Code Ann., Crim. Law Art. ("C.L.") § 2–201 (first-degree murder); C.L. § 4–204 (use of a handgun in the commission of a crime of violence). On September 29, 2010, the circuit court sentenced appellant to life imprisonment for first-degree murder and nineteen years' imprisonment consecutive for use of a handgun in the commission of a crime of violence, the first five years to be served without parole. Appellant noted an appeal raising three issues, which we quote and re-order as follows:

I. Whether the [circuit] court erred by admitting extensive gang-related evidence, including expert testimony, that [appellant] was a member of the Black G[uer]rilla Family gang? [2]

II. Whether the [circuit] court erred by asking the venire a "CSI" type voir dire question?

III. Whether the [circuit] court erred by admitting evidence that [appellant attempted to call] his friend, Austin Lockwood, an individual who would later testify as a State's witness at [appellant's] trial, from jail?

For the reasons set forth below, we answer each question in the negative. As such, we shall affirm the judgments of conviction.

## FACTUAL AND PROCEDURAL BACKGROUND

On February 21, 2009, at approximately 1:00 a.m., Officer Bernard Cox of the Baltimore City Police Department received a call to report to the 2500 block of West Baltimore Street in Baltimore City for a shooting. Upon arrival, Officer Cox found the body of Hubert Dickerson, Jr. and a large number of shell casings in the area. Officer Cox notified the homicide division, and Detectives Robert Dohony and Julian Min assumed responsibility for the investigation. The medical examiner determined that Dickerson died as a consequence of multiple gunshot wounds. On April 17, 2009, appellant was indicted in connection with the shooting.

---

**2.** Although throughout the briefs and the record, the name of the gang is spelled "Black Gorilla Family," the name of the gang is the "Black Guerrilla Family."

## Motion Concerning Gang–Related Testimony

On July 20, 2010, prior to the start of trial, the State moved to introduce evidence that the shooting was related to appellant's membership in the Black Guerrilla Family ("BGF") gang. The State advised that it intended to introduce fact evidence to establish that the motive for the offense was related to appellant's membership in the BGF, and to call Sergeant Dennis Workley of the Baltimore City Police Department as an expert in the area of gangs to testify about the workings of the BGF and appellant's tattoos, and to opine that appellant is a BGF member. According to the State, appellant's gang affiliation was directly connected to the issues of identity and motive and, therefore, admissible under Maryland Rule 5–404(b). In addition to the above, the State advised that, "assuming that the[ ] witnesses recant[ed] and their statements c[a]me in, [it] intend[ed] to put on [Sergeant] Workley who has previously [been] qualified as a gang expert to testify as to what BGF is, [and] what they do."

Appellant's counsel contended that "whether or not [appellant] is in the [BGF] or is not in the [BGF] ha[d] absolutely nothing to do with this case." Appellant's counsel argued that such evidence was not admissible as proof of either identity or motive, and that "[a]ll the State wants to do is poison the well because of the bad publicity everybody gets from the [BGF]." Appellant's counsel concluded: "I think the prejudice outweighs the probative value and I don't really think that the [BGF] had anything to do with this shooting."

After hearing argument from counsel, the circuit court determined that the gang-related evidence, including fact and expert testimony, was admissible to explain ". . . why [appellant] is the person who did the shooting[.]" The circuit court ruled orally from the bench as follows:

All right. Based upon my understanding at this time and in what was presented to me before, I am prepared to allow this information to come in. I believe that it is relevant in that the theory of the State's case as all parties seem to consider that the murder was as a result of a debt that was

owed, but why [appellant] is the person who did the shooting because a debt was owed to Bam [3] involves a question of their relationship. That their relationship that the State is prepared to prove involves the [BGF]—I believe makes that relevant evidence.

Also, the fact that in Mr. Falcon's [4] recorded statement, he claims to have been in an encounter between Bam whose name we will bring out later and [appellant] in which [appellant] is praised for doing the shooting, he came in saying ... That's my boy. Straight G[uer]rilla. I don't believe that's an insult. I believe that is praise and based upon that, I think that it is part and parcel of communications between possible co-conspirators here, but there is a way to avoid the prejudice involved. We've taken step number one already. We voir dired the jury to make sure that the mention of gangs is not something that would affect their ability to be fair and impartial and when the time comes for me to instruct the jury at the end of the trial, I'll want proposed instructions from each one of you about how I should address this and why the information was allowed so as to minimize the prejudice if any that is attended to.

After the circuit court's ruling, the following exchange occurred between appellant's counsel and the court when appellant's counsel sought clarification as to making objections during trial:

[APPELLANT'S COUNSEL]: Your Honor, I was wondering since any mention of the [BGF] obviously, you know, I'm going to be objecting to that and I've heard you ma[k]e your ruling.... [D]o I have to get up and object every single time the word [BGF] comes in or can I have a continuing objection to anything that has to do with the [BGF] because I don't think it should be mentioned in this trial. If you

---

3. Bam is the person who, according to the State's witnesses, directed appellant to commit the offense.

4. Falcon testified as a witness for the State at trial.

want me to get up and make an objection every time, I will, but I just want to make sure the record—

THE COURT: I understand exactly what you're saying, [appellant's counsel,] and this is a complex area with the continuing objection because if you—if I don't allow the continuing objection, you will underline the fact that you consider it to be prejudicial every time it's mentioned and I will allow you a continuing objection except as to matters that we have not discussed here.

[APPELLANT'S COUNSEL]: Yes, sir.

THE COURT: All right. If it's something beyond what we have talked about, about these witnesses who are on tape and whose commitment to testifying is questioned, to the extent that it's mentioned by them, with them, to them and from them, I'll allow your continuing objection. To the extent that it comes in beyond that from someone, I'll want you to object. To the extent that the State is bringing in people to explain what this reference means, your objection before they testify will be sufficient for that. All right.

[APPELLANT'S COUNSEL]: Okay. So, just, I think I understand what you're saying. Are you saying like if they try to bring experts in, I should object again.

THE COURT: You'll object before the expert testifies.

[APPELLANT'S COUNSEL]: Yes, Your Honor.

THE COURT: And the experts won't be testifying until it's relevant for them to do so. So, at that time, I can reconsider the decision that I've made here, but you object. That gives me a chance to reconsider it. As to these statements that we're going over and the opening statement from the State, you don't have to object to that because I am specifically now ruling that that is going to be admissible evidence. All right.

[APPELLANT'S COUNSEL]: Yes, sir.

## Trial

At trial, Dominick Falcon testified as a witness for the State. Falcon's testimony was inconsistent with a statement

that he had made to detectives, incriminating appellant, following the shooting. As such, during Falcon's testimony, the State introduced as substantive evidence an audio recording of an interview Falcon had with detectives on March 4, 2009. In the interview, Falcon stated that he heard appellant say, "I just killed a boy. That's how you're supposed to do it[.]" Falcon told law enforcement officers that, after the shooting, he heard Bam praise appellant, saying "that's my boy, straight G[uer]rilla." Falcon explained that "Guerrilla" meant "being in a gang. BGF, Black G[uer]rilla Family." Falcon also stated that appellant's nickname is "69" and that Bam's nickname is "Bootsy and Bam for real." The following exchange occurred between Falcon and Detective Min:

DETECTIVE MIN: Okay, Bootsy or Bam and that's the nickname on the street and they're a member of BGF.

MR. FALCON: Yes.

DETECTIVE MIN: Okay. What do those letters stand for?

MR. FALCON: Black G[uer]rilla Family.

In the interview, Falcon stated that, during the conversation with appellant, appellant stated "that he actually shot the boy, shot him on Baltimore and Shipley[.]" Falcon identified appellant from a photographic array and wrote on the back of the array, "We had a conversation ... He [appellant] was bragging about killing a boy on Baltimore Street. He was saying that's how you were supposed to do the job, not a half job. I had this conversation with 69." Falcon also identified Bam from a photographic array and wrote on the back of the array, "[h]e was there too and they were talking about that's how you're supposed to do the damn thing. Bam told 69 to kill him and Bam was saying, that's my f[ ] son. That's how you're supposed to do it."

Falcon told detectives that Bam was the boss and that appellant was a hit man for Bam. During Falcon's interview, Falcon and Detective Min had the following exchange as to Bam and appellant's relationship:

DETECTIVE MIN: And you were telling me about the relationship between 69 and Bam and what was the relationship between them?

MR. FALCON: They like, Bam like, like the head owner for real guy. They say so and they listen to him.

DETECTIVE MIN: The boss.

MR. FALCON: Yes, he was the boss, correct.

DETECTIVE MIN: And does 69 work for Bam[?]

MR. FALCON: Yes.

DETECTIVE MIN: Okay and how do you know this?

MR. FALCON: Cause I see it.

DETECTIVE MIN: What do you mean see it?

MR. FALCON: Like, I used to work for him too.

DETECTIVE MIN: You used to work for Bam too.

MR. FALCON: Yeah.

DETECTIVE MIN: What did you do for him?

MR. FALCON: Selling heroin and cocain[e] for real.

DETECTIVE MIN: So possibly, 69 is like a hit man for Bam.

MR. FALCON: Yeah, he like a hit man for real. . . . Yeah.

DETECTIVE MIN: Okay and you say he always carries a gun with him.

MR. FALCON: Yes.

At trial, Falcon testified that he lied to law enforcement officers when he told them that appellant admitted to committing the murder. Falcon testified that he lied during the March 4, 2009, interview, because law enforcement officers found cocaine and marijuana on him and he was scared, so he "came up with a lie." Falcon testified that he had no firsthand knowledge of appellant admitting to the crime. Detective Min, however, testified that no drugs were found on Falcon when law enforcement picked him up for the interview. Detective Min testified that, during the interview, Falcon told law enforcement officers that his life would be in danger if he testified at trial.

Austin Lockwood testified at trial as a witness for the State, and his testimony was inconsistent with a statement that he had made to detectives, incriminating appellant, after the shooting. As a result, during Lockwood's testimony, the State introduced as substantive evidence an audio recording of an interview Lockwood had with detectives on March 5, 2009. In the interview, Lockwood stated that appellant is a member of the BGF. At a point, during trial, the recording was stopped, and the following exchange occurred:

[APPELLANT'S COUNSEL]: ... This is [when] we're going to get into all that stuff about the [BGF]. I still have a continuing objection.

THE COURT: You have an objection and I have allowed the tape in completely. So, [your] objection was previously noted as to the tape ... and those portions of the tape that come in.... All right. We'll continue with the tape.

\* \* \*

(Taped statement of Austin Lockwood played for the Court.)

"DETECTIVE PURTELL: [Appellant]'s part of an organization, correct?

MR. LOCKWOOD: Yeah.

DETECTIVE PURTELL: And would you tell us the name of the organization?

MR. LOCKWOOD: BGF.

DETECTIVE PURTELL: Is this a violent group?

MR. LOCKWOOD: Yeah, extortion.

DETECTIVE PURTELL: Extortion, violence and where are they primarily? Are they in the jails? Are they in the streets?

MR. LOCKWOOD: They're in jails, the jails, but it overlaps in the street.

DETECTIVE PURTELL: It overlaps to the street and are you a member of BGF?

MR. LOCKWOOD: No.

DETECTIVE PURTELL: So, if you would go over to the jail, there would be some safety issues; is that correct? [5]

MR. LOCKWOOD: Yes.

DETECTIVE PURTELL: Cause you're not BGF and the suspect 69 is.

MR. LOCKWOOD: Yeah, that's right.["]

In the interview, Lockwood advised the detectives that appellant is known as "69," and that " '69' murdered a guy on Baltimore Street." Lockwood described the events on the night of the shooting as follows: "Dude was walking and '69' approached him, did some business stuff and shot him and killed him." Lockwood explained that "business stuff" meant that the victim owed "69" money. Lockwood told the detectives that he was "[r]ight up the street," had a clear view of the shooting, and it was definitely "69" who had fired the gun. Detective Min testified that he was present for the interview and Lockwood identified appellant as the shooter from a photographic array. On the back of the photographic array, Lockwood wrote: "69 murdered the guy on the corner on Friday, 21st of '09. 69 is the person in the picture. I saw 69 sho[o]t the man[.]"

In contrast, at trial, Lockwood testified that although he recalled speaking with detectives prior to trial on March 5, 2009, he did not recall the content of the conversation. Lockwood testified that he made statements to law enforcement officers during the interview because he had been in a fight with appellant, and Bam told him that he wanted appellant off the street. Lockwood testified that he, in fact, did not see appellant "do anything" and that he had previously attempted to explain that to the court. Detective Min testified that

---

5. At the time of the pretrial statement, Lockwood was the subject of an arrest warrant for failure to appear in court in connection with a controlled dangerous substance offense. Detective Min testified, at trial, that after the pretrial interview, Lockwood was sent to the Central Booking Facility. It is clear that, prior to the trial date, Lockwood was in jail. The person who purported to be his girlfriend advised appellant during the telephone call, which is the subject of this appeal, that Lockwood was "locked up."

Lockwood told law enforcement officers he was afraid that appellant, who was his roommate from "time to time[,]" would kill him "as soon as the interview was over[.]"

Joshua Johnson, who knew appellant for approximately a year at the time of trial, spoke with homicide detectives about the murder prior to trial and testified as a witness for the State. Detective Min testified that Johnson had been arrested on drug charges and told detectives that he had information relating to the homicide. At trial, Johnson testified initially that he "really [couldn't] remember" any conversations he overheard related to the murder. Later, however, Johnson testified that he overheard "69" say that he killed somebody. Johnson testified that appellant said that someone owed Bam money, and that Bam instructed appellant to kill this person. When asked whether people are afraid of appellant and Bam, Johnson testified, "Yeah." Johnson testified that appellant said he used a .45 caliber "glock" gun to shoot the person.

Ashley Sparrow testified at trial as a witness for the State. Like Lockwood's and Falcon's, Sparrow's testimony was inconsistent with a statement that she had made to detectives following the shooting. As a result, during Sparrow's testimony, the State introduced as substantive evidence an audio recording of an interview Sparrow had with detectives on February 27–28, 2009. In the interview, Sparrow stated that she overheard a conversation between "69" and "Stacks." When "Stacks" asked "69," "Is that n[ ] dead?," Sparrow heard "69" respond, "I don't know if he's dead, but I know I popped his a[ ]." Sparrow stated that she "kind of figured they w[ere] talking about the guy on Baltimore Street[.]" During the interview, Sparrow identified Bam and "69" from photographic arrays.

In contrast, at trial, Sparrow testified that, although she recalled speaking with detectives, she was intoxicated and high at the time and did not remember anything that she said. Sparrow testified that she could not recall anything about the photographic arrays. Sparrow testified that she never heard appellant say that he shot someone. Detective Min testified

that, when Sparrow spoke with detectives on February 27, 2009, she did not appear to be intoxicated or high. Detective Min testified that Sparrow told him that she would not testify in court because she would be killed.

Over appellant's objection, Sergeant Dennis Workley of the Baltimore City Police Department testified as an expert witness for the State in the field of gangs, gang membership, gang insignia, gang ranking, and gang identification. Sergeant Workley gave testimony on the following topics: (1) the history and structure of the BGF, (2) the Division of Corrections's classification of appellant as a member of the BGF and appellant's membership in the gang, and (3) appellant's tattoos. Sergeant Workley testified that the BGF is a prominent prison gang in Maryland and that it controls "most of the jails in the State[,]" "what goes on inside[,]" "the narcotic trade inside" the jails, and "the inflow of information going back and forth" from outside to inside of the jails. Sergeant Workley testified that the BGF is run like a business, uses it own language, ranks its members, and has a published constitution that outlines the gang's rules. The State asked Sergeant Workley, "[a]nd has the Department of Corrections listed [appellant] as a member of the [BGF]?," to which Sergeant Workley replied, "[y]es, they have." Appellant's counsel did not object to the question or response. A certified copy of the Division of Corrections's records listing appellant as a gang member, State's Exhibit No. 36, was not admitted into evidence. Sergeant Workley testified that, in his opinion, appellant is a member of the BGF.

Sergeant Workley examined pictures of appellant's tattoos and testified that several of the tattoos had gang-related meanings. For example, Sergeant Workley testified that tattoos of "Baltimore" and "Franklin," on the outside of appellant's right and left forearms, indicated the area in which appellant does business, that a tattoo of a weapon and "187," on the inside of appellant's left forearm, stood for "a penal code in California for homicide[,]" that an "OG" tattoo, on appellant's left forearm, meant "original gangster" and corresponded to a tattoo of "work real, real n[ ] don't die[,]" also on

appellant's left forearm, that another tattoo of weapons, on appellant's left bicep, stood for "death before dishonor[,]" and that appellant had tattooed his "street name" ("Sixx 9") on his left pectoral muscle.

During Sergeant Workley's testimony as to appellant's tattoos, the following exchange occurred during a bench conference:

[APPELLANT'S COUNSEL]: ... I just want to make sure ... I've objected properly for the record .... to the best of what I've heard in the case, nobody ever said that this was a gang ordered hit. So, that's why I have to object to all this stuff about, about the gang and the prejudice is outweighing the probative value.

Then you have these tattoos that have guns. These tattoos have death before dishonor and all this other stuff and this is a, this is a murder case and none of this stuff has anything to do with the identification of [appellant] involved in this particular murder. It isn't like anybody said, I saw this tattoo. I saw anything. So, we've got a murder case and I just think that the prejudice clearly outweighs the probative value. It poisons the well for the jury. So, that's why I have to object to all of these and any of [Sergeant Workley]'s testimony.

THE COURT: All right.... I understand your objections.... **Because we have witnesses who have changed their testimony from the time that they met with the police shortly after this event to, to taking four different tac[k]s of denying their statements.** One said that he lied because he was ordered to do so by Bam, to lie on [appellant]. Another said, he doesn't remember anything about what he said, but then in Court, identified and said, oh yeah, I did say that. That's what it was. The third person said that she was drunk and didn't know anything about any of these statements. Never knew anything about it, but never said anything to the police and then the fourth said that he lied because the police forced him to[ ]. Each of them in their statements indicate some level of fear of [appellant], some specifically stating because of his gang involvement or

Bam's gang involvement. **That's how it got to be relevant in the case.** It was in the statements. I wasn't going to clear it out of the statements.

Now, the question is whether or not the State should be allowed to prove that [appellant] is in fact a member of a gang. I think because of the way in which the information came from the reluctant witnesses, it is unavoidable. Had the witnesses not been and I am satisfied afraid to testify, we could have kept this all out, **but because they changed their testimony because I am satisfied they were afraid to testify truthfully, then everything they said virtually has to come in to explain why they've changed their testimony.** It is something of ... a very negative side [e]ffect of witnesses being afraid not to testify because if they testify, we can focus on their testimony. If they don't testify and rely on what they have said in the past, it's virtually everything they've said in the past comes in. So that's why it's part of this case.

**Now, the witness who is before us now and the evidence that we're considering is only for the purpose of establishing whether or not [appellant] is a member of a gang.** I remind you and the record that in anticipation of this, we asked the general voir dire question about whether information or references about gang activity would interfere with the juror's ability to render a fair and impartial verdict. They said, no and I am anticipating from each of you some form of specific instruction for me to give them about how they should be processing this information[.]

(Emphasis added). Appellant's counsel did not cross-examine Sergeant Workley.

At the end of trial, the circuit court asked the parties how they wanted the jury to be instructed as to the gang-related evidence. Because neither side advanced an instruction, the circuit court proposed an instruction concerning the gang-related evidence. In response to the circuit court's proposed instruction, appellant's counsel stated: "I'm in a bad spot because I'm objecting to all the gang stuff coming in and I'm going to try to come up with an instruction to cure it. So, I'll

leave it with the Court." The circuit court solicited suggestions and told the parties that it could "also give nothing." Appellant's counsel replied: "Well, I certainly want something that he's not being charged with any crime of being in a gang." At the end of the discussion, the circuit court noted: "All parties are in agreement. That's the instruction that I will give them." The circuit court instructed the jury as follows:

> Now, you have heard evidence of the Defendant's involvement in gang activity. The Defendant is not charged with a crime involving being a member of any gang. Information about the Defendant's involvement if any with a gang was allowed only for you to understand the relationship between the Defendant and other parties in this case.

Appellant's counsel did not object to the instruction and did not note an exception to the instruction when the circuit court inquired about exceptions after the instructions were given.

### *Voir Dire*

Before trial, during *voir dire*, the circuit court asked the venire panel the following question:

> Now, ladies and gentlemen, there may be some mention or allegations that the victim, [appellant] or witnesses may have some involvement with a gang. Would the fact that it was alleged that a person had a connection to a gang affect your ability to fairly and impartially decide the case? If anyone thinks that would, that would affect your ability to fairly and impartially decide the case, please stand and I'll take your number.

In response to the question, Juror No. 034 and Juror No. 110 [6] stood.

The circuit court also asked the venire panel the following question:

---

6. Juror No. 110 was subsequently struck for cause, after individual questioning, and not impaneled as a member of the jury.

Now, ladies and gentlemen, there are many different types of evidence. There is direct evidence. There is circumstantial evidence. Direct evidence is someone who says, I saw this. I did this. I heard this. So and so said this to me. That's direct evidence. Circumstantial evidence is evidence that you have to draw a conclusion based upon it about something important in the case.

Within this world of, of science or circumstantial evidence is the world of scientific evidence and within that world there is now what is referred to as crime scene investigation type of evidence. The type of evidence that's been dramatized in the television programs, the Hannibal Lecter books and movies that deal with trace evidence. Trace evidence being hair and fingerprints and DNA and one book fingerprints on an eyeball. These are dramatizations of forms of circumstantial evidence. The jurors will be called upon to consider all of the evidence that is presented no matter who it is presented by. No matter what the person, the party is urging you to consider. Is there any member of the jury panel who would require trace evidence in order to accept a proposition presented by one of the parties? In other words, you say well, she didn't present this or he didn't present that. I can't accept it. Is there any member of the jury panel who set that form of artificial standard? If your answer is, yes, please stand and I'll take your number. Okay, your number in the back, sir, again.

JUROR: 034.

No other juror stood in response to the question. Appellant's counsel failed to lodge any objection at the time the questions were asked of the venire panel, or during the individual questioning of potential Juror No. 034.[7] At the end of *voir*

---

7. During individual questioning, the circuit court asked Juror No. 034 about his response to the "CSI-type" question, in pertinent part, as follows:

THE COURT: ... Suppose it's just a testimony of witnesses. I saw this. I did this, that. I mean that, that and some scientific evidence like photos of the scene and things like that, but the case really is

*dire,* appellant's counsel exercised a peremptory challenge and struck Juror No. 034. Juror No. 034 was not impaneled as a member of the jury. At the conclusion of the jury selection process, appellant accepted the impaneled jury, without objection.

### Jailhouse Telephone Call

On July 20, 2010, during a motions hearing, appellant's counsel moved to exclude a recorded telephone call made by appellant on October 5, 2009, from the Baltimore City Detention Center, to someone who was purportedly Lockwood's girlfriend, looking for Lockwood. The State argued that the telephone call was relevant because it demonstrated that appellant was attempting to locate Lockwood to intimidate him and prevent him from testifying, and because it would assist in explaining why Lockwood would change his story and recant his eyewitness identification of appellant at trial. In response, appellant's counsel argued that at the time of the call on October 5, 2009, appellant did not know the names of the witnesses in the case against him as the State had only provided numbers ("witness number one, witness number two[,]" etc.), rather than names. The circuit court observed that, although appellant was not told the names of the witnesses, "[t]here's a big difference between not knowing and not being told. Not being told and knowing is almost evidence of guilt." After hearing argument from both parties, the circuit court denied the motion to exclude the telephone call, ruling orally from the bench, in pertinent part, as follows:

> based upon what witnesses have to say. Do you think you could come to a fair and impartial conclusion based on that?
> JUROR [NO. 034]: Yeah, I think I could.
> THE COURT: You wouldn't ... set an artificial bar so if you don't have hair evidence then I can't—
> JUROR [NO. 034]: If you've got an eyewitness, of course, that would ... that would play a part.
> THE COURT: All right. All these things that we've talked about ... do you think that you could listen to the evidence, listen to my instructions about the law, listen to the arguments from the lawyers and render a fair verdict in this case?
> JUROR [NO. 034]: I think I can do to the best of my ability. Yes.

I mean, . . . if it means anything, it means well—it is open to the interpretation the State's presenting or it's open to an interpretation that means absolutely nothing. That's the art of arguing what the evidence is, but I don't believe that's a reason to exclude the evidence. It is evidence that will not cause us to go off on any type of tangent and it is consistent and [the] motion to exclude the conversation of October 5, 2009 is denied.

At trial, Sergeant Monique Mitchell testified, as a witness for the State, about the procedures for recording inmate telephone calls at the Baltimore City Detention Center. During Sergeant Mitchell's testimony, the State moved to play State's Exhibit No. 24, the CD of the October 5, 2009, telephone call to Lockwood, and the following exchange occurred:

[THE STATE]: Your Honor, with the Court's permission, I've marked for identification as State's Exhibit No. 24, the CD and I would like to play that for [Sergeant] Mitchell to hear.

[APPELLANT'S COUNSEL]: Objection.

THE COURT: Excuse me.

[APPELLANT'S COUNSEL]: I'm objecting.

THE COURT: Come on up.

[APPELLANT'S COUNSEL]: I just want to play the initial part of what she's talking about, first and then have her go into more detail about—

THE COURT: Well, what's your, what's the basis of your objection?

[APPELLANT'S COUNSEL]: This is not, just let me make sure I understand. This is, this is the call that was supposedly made from my client to a woman looking for—

[THE STATE]: Artie's girlfriend looking for Artie.[8]

[APPELLANT'S COUNSEL]: Okay. All right. I'm going to object based, you know, based on what's the relevance of that tape to this proceeding.

---

8. According to appellant, "Artie" is a nickname for Lockwood.

THE COURT: Very well. I've already considered that and denied your motion to exclude—

[APPELLANT'S COUNSEL]: Yes, sir.

THE COURT:—but I'm going to allow it in.

The jury was given copies of transcripts of the recorded telephone call, State's Exhibit No. 26. Thereafter, the recording of appellant's outgoing call from the Baltimore City Detention Center was played for the jury. During the call, the following exchange occurred between an unidentified speaker, supposedly Lockwood's girlfriend, and appellant:

UNIDENTIFIED SPEAKER: Who is this?

[APPELLANT]: 69 calling for Artie. . . . Where he at, he ain't there?

UNIDENTIFIED SPEAKER: No.

[APPELLANT]: Where he at?

UNIDENTIFIED SPEAKER: Who is this?

[APPELLANT]: 69.

UNIDENTIFIED SPEAKER: 69, how did you get this number? Who gave you this number?

[APPELLANT]: Artie.

\* \* \*

UNIDENTIFIED SPEAKER: He told you to call, Artie is locked up.

[APPELLANT]: When did he get locked up?

UNIDENTIFIED SPEAKER: He been locked up. Why would he give you this number? Oh, you're the one he called his father—

[APPELLANT]: Hah, yeah. . . . What did he get locked up for? . . . When do[es] he go to court?

UNIDENTIFIED SPEAKER: He go[es] to court tomorrow.

[APPELLANT]: He coming home.

UNIDENTIFIED SPEAKER: I don't know. I'll see when I go to court tomorrow.

[APPELLANT]: That is the dumbest thing—(inaudible).

UNIDENTIFIED SPEAKER: Um, when he write me it say 401 Eager Street.

[APPELLANT]: 401 Eager Street. What's his id number? What is the id number?

* * *

UNIDENTIFIED SPEAKER: ... His id number is 308 ... 2575.

[APPELLANT]: My man is crazy. It ain't even funny. This is crazy. That's why I'm going to be mad at his dumb a[ ]. ... All right. If you talk to him, tell him I said I love him.

After the telephone call was played for the jury, State's Exhibits No. 24 and No. 26, the CD and transcript of the telephone call, were admitted into evidence over appellant's objection.

## DISCUSSION

## I.

### Gang–Related Evidence

### A. The Contentions

Appellant contends that the circuit court erred by admitting gang-related evidence, specifically, the pretrial statements by Lockwood and Falcon, as well as Sergeant Workley's expert testimony concerning the BGF. Appellant argues that the "inner workings" of the BGF and appellant's involvement with the gang were not relevant to the issues in the case as there was no evidence that the murder was gang-related and, even if "minimally relevant," the probative value of the evidence was substantially outweighed by the danger of unfair prejudice. Appellant asserts that there "was absolutely no evidence admitted at trial that the victim of the shooting was a member of a rival gang, did anything to provoke the ire of the BGF, or was in any way connected with the BGF[,]" or that the victim owed money to anyone. Appellant maintains that the circuit court abused its discretion by allowing Sergeant Workley to

testify about the BGF, appellant's tattoos, and appellant's classification as a gang member by the Division of Corrections, and to offer the opinion that appellant was a member of the BGF.

Appellant acknowledges that it was permissible for the State to present evidence that witnesses recanted their statements because of fear, but maintains that it was not permissible for the witnesses to testify that the reason for their fear was his gang affiliation. Appellant argues that Sergeant Workley's testimony "ran too far afield" from explaining witnesses' recantations, and that the jury did not need expert testimony to "understand that it is reasonable for a citizen to fear a gang member." Appellant contends that the admission of the gang-related evidence was not harmless beyond a reasonable doubt as there was no physical evidence linking him to the offense.

The State responds that the circuit court properly exercised its discretion in admitting gang-related evidence for the purpose of explaining the reason the witnesses recanted statements previously provided to law enforcement officers. The State contends that the circuit court properly determined that the gang-related testimony was relevant and admissible because it explained inconsistencies between the witnesses' pretrial statements and trial testimony. The State argues that, under the circumstances of the case, the circuit court appropriately found that evidence of appellant's relationship with Bam, including that appellant was a member of the BGF, as well as evidence concerning the BGF generally, "was relevant to the jury's determination of the credibility of the in-court testimony given by Lockwood, Johnson, Sparrow and Falcon."

The State maintains that, because appellant failed to present any argument on appeal in support of the contention that the probative value of the evidence was substantially outweighed by the danger of unfair prejudice, this Court should decline to address the issue. On the merits, the State argues that the circuit court properly exercised its discretion in determining that the danger of unfair prejudice did not sub-

stantially outweigh the probative value of the gang-related evidence. Alternatively, the State asserts that any error in admission of the testimony was harmless beyond a reasonable doubt, given: (1) the circuit court's *voir dire* question, asking whether jurors could be fair and impartial even if evidence demonstrated that appellant had a connection to a gang; and (2) the circuit court's limiting jury instruction as to how the gang-related evidence was to be considered.

In a reply brief, appellant contends that "the threshold requirement established in [*Gutierrez v. State,* 423 Md. 476, 32 A.3d 2 (2011)] to allow for expert testimony regarding the [BGF] has simply not been met in this case[,]" as the State failed to present evidence that the BGF was connected to the shooting. Relying on *Gutierrez,* appellant argues that expert testimony is permissible only if the crime itself is gang-related, and that the State failed to explain how expert testimony would assist the jury in understanding the reason for the witnesses' recantations.

## B. Standard of Review

In *Gutierrez,* 423 Md. at 485–86, 32 A.3d 2 the Court of Appeals outlined the applicable standard of review as to the admissibility of expert testimony:

Maryland Rules 5–702 through 5–706 govern expert testimony. Specifically, [Maryland] Rule 5–702 provides:

Expert testimony may be admitted, in the form of an opinion or otherwise, if the court determines that the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue. In making that determination, the court shall determine (1) whether the witness is qualified as an expert by knowledge, skill, experience, training, or education, (2) the appropriateness of the expert testimony on the particular subject, and (3) whether a sufficient factual basis exists to support the expert testimony.

In *Raithel v. State,* 280 Md. 291, 372 A.2d 1069 (1977), this Court articulated the standard of review for the admissibility of expert testimony:

[T]he admissibility of expert testimony is a matter largely within the discretion of the trial court, and its action in admitting or excluding such testimony will seldom constitute a ground for reversal. It is well settled, however, that the trial court's determination is reviewable on appeal, and may be reversed if founded on an error of law or some serious mistake, or if the trial court has clearly abused its discretion.

*Id.* at 301, 372 A.2d at 1074–75 (quotation marks and citations omitted). A reviewing court may find an abuse of discretion where the prejudice of the admitted testimony outweighs its probative value. *See State v. Faulkner,* 314 Md. 630, 641, 552 A.2d 896, 901 (1989). Prejudice that would "outweigh probative value involves more than mere damage to the opponent's case." *State v. Allewalt,* 308 Md. 89, 102, 517 A.2d 741, 747 (1986).

### C. Law

In *Snyder v. State,* 361 Md. 580, 591–92, 762 A.2d 125 (2000), the Court of Appeals discussed the concept of relevance as follows:

Relevance is a relational concept. Accordingly, an item of evidence can be relevant only when, through proper analysis and reasoning, it is related logically to a matter at issue in the case, *i.e.,* one that is properly provable in the case. In order to find that such a relationship exists, the trial court must be satisfied that the proffered item of evidence is, on its face or otherwise, what the proponent claims that item to be, and, if so, that its admission increase or decreases the probability of the existence of a material fact. Moreover, the relevancy determination is not made in isolation. Instead, the test of relevance is whether, in conjunction with all other relevant evidence, the evidence tends to make the proposition asserted more or less probable.

(Citations omitted). Maryland Rule 5–403 provides, in pertinent part: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice[.]" In *Odum v. State,* 412 Md. 593, 615, 989

A.2d 232 (2010), the Court discussed the balancing test provided in Maryland Rule 5–403 and the concept of prejudice:
> [T]he fact that evidence prejudices one party or the other, in the sense that it hurts his or her case, is not the undesirable prejudice referred to in [Maryland] Rule 5–403. Evidence may be unfairly prejudicial if it might influence the jury to disregard the evidence or lack of evidence regarding the particular crime with which he is being charged. The more probative the evidence is of the crime charged, the less likely it is that the evidence will be unfairly prejudicial.
>
> It has been said that [p]robative value is outweighed by the danger of *unfair* prejudice when the evidence produces such an emotional response that logic cannot overcome prejudice or sympathy needlessly injected into the case.

(Citations and internal quotation marks omitted) (alterations and emphasis in original).

### (1) Maryland Case Law–Gangs

Maryland appellate courts have reviewed the admission of gang-related evidence under circumstances in which the evidence was relevant to establish motive or identity, and where the offense was found to be "gang-related." In *Ayala v. State,* 174 Md.App. 647, 664, 666, 923 A.2d 952, *cert. denied,* 401 Md. 173, 931 A.2d 1095 (2007), this Court held that the trial court properly exercised its discretion in admitting gang-related evidence, including expert testimony, as "the evidence was highly probative in establishing motive and was not unduly prejudicial under the circumstances." In *Ayala,* 174 Md.App. at 651–52, 923 A.2d 952, "[t]he State presented evidence that Ayala and his two accomplices were members of 'MS–13,' a violent Latino gang. The State theorized that the three men killed [the victim] because they believed-possibly mistakenly-that he was a member of a rival gang known as the '18th Street gang.'" At trial, the State presented expert testimony from Detective Michael Porter of the Fairfax County, Virginia Police Department's Gang Investigation Unit. *Id.* at 654, 923 A.2d 952. "Detective Porter [described] the history and cus-

toms of the MS–13 gang." *Id.* Detective Porter reviewed photographs seized from Ayala's home depicting persons, including Ayala, wearing MS–13 colors, making hand signals, and having gang-related tattoos. *Id.* at 655–56, 923 A.2d 952. Detective Porter opined that Ayala was a member of MS–13, and that Ayala, in a fight against a member of a rival gang, "could not just sit by and do nothing" or else he "would have been disciplined[.]" *Id.* at 656, 923 A.2d 952.

With Judge Arrie W. Davis speaking for the Court, we stated that "[t]here can be little doubt that evidence that a defendant is a member of an organization known for violent acts may be evidence of bad character or prior bad acts[,]" which is usually prohibited unless it falls under a purpose listed in Maryland Rule 5–404(b), such as proof of motive or identity. *Id.* at 658, 923 A.2d 952. We observed that courts in other jurisdictions "have consistently held that evidence of a defendant's membership in a gang is admissible if the evidence is relevant to establish the defendant's motive." *Id.* at 659, 923 A.2d 952. We stated that "[t]here may be strong prejudice against street gangs . . . but that alone does not render gang evidence inadmissible. Gang evidence is admissible despite the prejudice that attaches if it is relevant and particularly if it is crucial in establishing motive." *Id.* at 663, 923 A.2d 952 (quoting *People v. Davis,* 335 Ill.App.3d 1, 268 Ill.Dec. 829, 779 N.E.2d 443, 456 (2002), *appeal denied,* 202 Ill.2d 680, 272 Ill.Dec. 361, 787 N.E.2d 176 (2003)). After reviewing cases from New Mexico and Illinois, we held as follows:

> [T]he gang testimony presented by the State corroborated the defendant's—in this case Ayala's—pre-trial statement that the perpetrators and the victim were members of rival gangs. Further, the evidence served to explain the "otherwise inexplicable," by providing a motive for a brutal and seemingly senseless killing. . . .

**While we establish no bright-line rule as to the admissibility of gang evidence in Maryland,** we conclude that the trial court properly exercised its discretion when it admitted the evidence in question. As the trial court deter-

mined, the evidence was highly probative in establishing motive and was not unduly prejudicial under the circumstances.

*Id.* at 664, 923 A.2d 952 (emphasis added) (citations omitted). We concluded that the probative value of Detective Porter's testimony was "significant" and that the factual basis for the detective's opinion was "strong." *Id.* at 666, 923 A.2d 952. *See also Wimbish v. State,* 201 Md.App. 239, 262–63, 29 A.3d 635 (2011), *cert. denied,* 424 Md. 293, 35 A.3d 489 (2012) ("[T]he evidence [in this case] established a motive for the crime, specifically that [Wimbish], 'loyal to his Blood family members,' went from Baltimore to Columbia 'to take care of business for another Blood member.' Thus, . . . the [trial] court did not err in concluding that the evidence of [Wimbish]'s gang affiliation fit within the 'motive' exception of [Maryland] Rule 5–404(b)." (Citation omitted)).

In *Gutierrez,* 423 Md. at 481, 32 A.3d 2 the Court of Appeals considered "whether expert testimony about the history, hierarchy, and common practices of a street gang [was] admissible as proof of motive or [was] prohibited by Maryland Rule 5–404(b) as evidence of other crimes, wrongs, or acts." The Court held that "such testimony is permissible where fact evidence establishes that the crime charged was gang-related and the probative value of the testimony is not substantially outweighed by any unfair prejudice to the defendant." *Id.* at 481–82, 32 A.3d 2. In *Gutierrez,* Sergeant George Norris, Supervisor of the Prince George's County Gang Unit, testified as an expert witness for the State about the MS–13 gang culture. *Id.* at 484, 32 A.3d 2. Sergeant Norris opined, based on pictures on the defendant's MySpace page, that the defendant was affiliated with MS–13. *Id.*

In reviewing the admissibility of gang-related evidence, the Court of Appeals observed that "[n]umerous jurisdictions have permitted the inclusion of such evidence as relevant and not unduly prejudicial." *Id.* at 490, 32 A.3d 2. The Court stated that "[g]enerally, a gang expert's testimony is relevant and not unduly prejudicial when other evidence demonstrates that the crime was gang-related." In reviewing the approach of other

states to the admission of gang-related evidence, the Court observed that the Supreme Court of California held that "testimony on a gang's general practice of witness intimidation was necessary to explain why witnesses who had identified the gang-tattooed defendant as the gunman later recanted at trial." *Id.*

In *Gutierrez,* 423 Md. at 495–96, 32 A.3d 2 the Court of Appeals explicitly held:

> [W]e must determine whether the trial court erred in admitting testimony of a gang expert at all, and if not, whether Norris's testimony was unfairly prejudicial. In doing so, we remain ever-cognizant of the highly incendiary nature of gang evidence and the possibility that a jury may determine guilt by association rather than by its belief that the defendant committed the criminal acts. We agree with the Supreme Court of New Mexico that courts must be vigilant in guarding against the improper use of gang affiliation evidence "as a backdoor means of introducing character evidence by associating the defendant with the gang and describing the gang's bad acts." **Thus, we hold that the threshold requirement for the admissibility of gang expert testimony is *fact* evidence showing that the crime was gang-related.** Proof of such a link transforms a defendant's gang membership, current or prospective, from an impermissible prior bad act to a concrete component of the crime for which the defendant is on trial. To be clear, this requirement may be satisfied by fact evidence that, at first glance, may not indicate gang motivations, but when coupled with expert testimony, provides the gang-crime connection. . . . In adopting this threshold requirement, we are simply saying that a defendant's membership in a gang, in and of itself, is not enough.

(Some emphasis in original) (citations and footnotes omitted). In *Gutierrez,* because the evidence provided by three fact witnesses indicated that the victim's murder was motivated by the defendant's affiliation with the MS–13 gang, the Court concluded that the evidence was sufficient to "open the door for expert testimony[.]" *Id.* at 497, 32 A.3d 2.

### (2) Authorities from Other Jurisdictions—Gangs

Although Maryland appellate courts have not directly addressed the issue now before us—whether gang-related evidence, including expert testimony, is admissible to explain why witnesses recanted, at trial, information previously given to law enforcement officers—courts in other jurisdictions have addressed the matter. In *People v. Ruiz*, 62 Cal.App.4th 234, 240, 72 Cal.Rptr.2d 572 (1998), the Court of Appeal of California, Second Appellate District, Division Seven, discussed the admission of gang-related evidence, observing:

> [E]vidence of gang membership has been admitted to prove bias, provided it is not cumulative to other properly admitted, and less inflammatory, evidence. Evidence of a relationship between a witness and a party is logically relevant to show bias. One such relationship is common membership in an organization: business, fraternal, national, etc.

(Citations omitted).

In *People v. Gonzalez*, 38 Cal.4th 932, 44 Cal.Rptr.3d 237, 135 P.3d 649, 656 (2006), *cert. denied*, 549 U.S. 1140, 127 S.Ct. 996, 166 L.Ed.2d 752 (2007), the Supreme Court of California held that the trial court acted within its discretion in permitting expert testimony on street gangs in East Los Angeles where, at trial, witnesses repudiated information previously given to law enforcement officers. In *Gonzalez*, the defendant was a member of the Lott Stoners 13 street gang and had "Lott 13" tattooed on his neck and, by the time of trial, on the back of his head. *Id.*, 44 Cal.Rptr.3d 237, 135 P.3d at 652. At trial, "[t]he prosecution presented two kinds of evidence that [the] defendant was the gunman: (1) eyewitness identifications that were, with one exception, repudiated at trial; and (2) evidence, also repudiated at trial, that [the] defendant told a fellow gang member that he was the shooter." *Id.* After acceptance by the trial court as an expert on street gangs in East Los Angeles, Sergeant Al Garcia testified, in pertinent part, that, in gang culture, it was "bad" to be someone who assisted law enforcement as a witness or informant, and that such people "are often intimidated not to testify." *Id.*, 44

Cal.Rptr.3d 237, 135 P.3d at 653–54. Upon review, the Supreme Court of California observed that California appellate courts "have long permitted a qualified expert to testify about criminal street gangs when the testimony is relevant to the case[,]" including testimony as to "the culture and habits of criminal street gangs[.]" *Id.*, 44 Cal.Rptr.3d 237, 135 P.3d at 656 (citations and internal quotation marks omitted). The Supreme Court of California held:

> This testimony [from Sergeant Garcia] was quite typical of the kind of expert testimony regarding gang culture and psychology that a court has discretion to admit. Whether members of a street gang would intimidate persons who testify against a member of that or a rival gang is sufficiently beyond common experience that a court could reasonably believe expert opinion would assist the jury.... Sergeant Garcia's testimony was relevant to help the jury decide which version of the testimony was truthful: the eyewitnesses' initial identifications of defendant as the shooter, and [a fellow gang member]'s initial statement that defendant admitted being the shooter, or the later repudiations of those identifications and that statement. "Evidence that a witness is afraid to testify or fears retaliation for testifying is relevant to the credibility of that witness and is therefore admissible. An explanation of the basis for the witness's fear is likewise relevant to her credibility and is well within the discretion of the trial court." Evidence of possible intimidation would help explain why the witnesses might repudiate earlier truthful statements.

*Id.*, 44 Cal.Rptr.3d 237, 135 P.3d at 657 (citations omitted). The Supreme Court of California observed that Sergeant Garcia "did not express an opinion as to whether the particular witnesses [who recanted] had been intimidated." *Id.*, 44 Cal.Rptr.3d 237, 135 P.3d at 658. Sergeant Garcia provided only general expert testimony regarding gangs and "[i]t was up to the jury to determine how much to credit this testimony and, if it found it credible, to apply it to the rest of the evidence it heard." *Id.*

Illinois appellate courts have also addressed the admission of gang-related expert testimony to explain motive and why a witness recanted an earlier statement. In *People v. Tolliver*, 347 Ill.App.3d 203, 282 Ill.Dec. 900, 807 N.E.2d 524, 541 (2004), *appeal denied*, 211 Ill.2d 610, 291 Ill.Dec. 391, 823 N.E.2d 977 (2004), *cert. denied*, 544 U.S. 1019, 125 S.Ct. 1986, 161 L.Ed.2d 858 (2005), the Appellate Court of Illinois, First District, Fifth Division, held that admission of gang-related evidence, including expert testimony, was proper and that the trial court "committed no clear abuse of discretion[.]" [9] In *Tolliver*, 282 Ill.Dec. 900, 807 N.E.2d at 530, Sergeant Mark Moore of the Chicago Police Organized Crime Division, narcotic and gang investigation section, testified as to the rules, bylaws, slang terminology, and operation and security of illegal drug sales of the Gangster Disciples street gang. Sergeant Moore testified that the gang had bylaws and rules, that a broken rule is a violation, and that the gang beats or kills those who testify against each other. *Id.*, 282 Ill.Dec. 900, 807 N.E.2d at 530.

The Appellate Court of Illinois discussed the admission of the above gang-related testimony as follows:

> Gang-related evidence is admissible to show common purpose or design, or to provide a motive for an otherwise inexplicable act. Gang-related evidence is also relevant to identification or to corroborate a defendant's confession. However, such evidence must relate to the crime charged.... Testimony regarding the background, history and criminal activity of the gangs is improper if peripheral to the offense at issue.

*Id.*, 282 Ill.Dec. 900, 807 N.E.2d at 541 (citations omitted). Accordingly, the Appellate Court of Illinois held that the trial

---

**9.** At trial, six of the State's witnesses testified contrary to their prior grand jury testimony and their prior statements; many testified that law enforcement officers threatened them into providing the prior testimony and statements implicating and identifying the defendant as the shooter. *Tolliver*, 282 Ill.Dec. 900, 807 N.E.2d at 531–34. The State introduced the grand jury testimony and prior statements of the six witnesses as substantive evidence. *Id.*, 282 Ill.Dec. 900, 807 N.E.2d at 534.

court did not abuse its discretion in admitting gang-related evidence as it was relevant to show motive, presence, and identification. *Id.* The defendant specifically contended that the trial court improperly admitted testimony that the gang had rules, that broken rules are considered violations, and that people who testify against the gang are beaten or killed in retaliation. *Id.*, 282 Ill.Dec. 900, 807 N.E.2d at 542. The Appellate Court of Illinois quickly disposed of the contention, holding: "The trial court committed no abuse of discretion, as this evidence was relevant and admissible to show why several witnesses recanted their grand jury testimony against defendant, a member of the Gangster Disciples." *Id.*

In *People v. Dixon*, 378 Ill.App.3d 535, 317 Ill.Dec. 788, 882 N.E.2d 668, 681 (2007), *appeal denied*, 227 Ill.2d 587, 321 Ill.Dec. 253, 888 N.E.2d 1186 (2008), the Appellate Court of Illinois, First District, First Division, held that "the trial court did not abuse its discretion by admitting gang-related evidence for the purpose of explaining the witnesses' change of heart at trial." In *Dixon*, 317 Ill.Dec. 788, 882 N.E.2d at 670, three of four State's witnesses recanted information previously given to law enforcement officers. The three witnesses who recanted were impeached with their grand jury testimony and other prior statements, in which they implicated and identified the defendant as the shooter. *Id.* The three witnesses claimed either at or before trial that they were afraid of the defendant's gang. *Id.* After his acceptance by the trial court as an expert on gangs, a detective testified that one of the defendant's tattoos was a gang tattoo, and that a "violation" occurs when a gang member testifies against another gang member or talks to the police. *Id.*, 317 Ill.Dec. 788, 882 N.E.2d at 677–78. The detective testified that the defendant was a member of the Traveling Vice Lords gang. *Id.*, 317 Ill.Dec. 788, 882 N.E.2d at 678.

In reviewing the admissibility of gang-related evidence, the Appellate Court of Illinois stated:

Gang-related evidence may be "admitted so long as it is relevant to an issue in dispute and its probative value is not substantially outweighed by its prejudicial effect." Gang-

related evidence is probative if it explains a witness's motive to lie about the defendant's involvement in the offense. Thus, this court has previously held that a trial court did not abuse its discretion by admitting gang-related evidence, to explain why trial witnesses recanted their grand jury testimony and testified differently at trial.

*Id.*, 317 Ill.Dec. 788, 882 N.E.2d at 681 (citations omitted). Accordingly, the Appellate Court of Illinois held that the trial court in *Dixon* did not abuse its discretion by admitting gang-related evidence to explain the witnesses' recantation at trial. *Id.* In so holding, the Appellate Court of Illinois observed that the State need not prove that the witness belonged to a gang, as a gang "may inspire fear in nonmembers as well as its own members." *Id.*

### D. Analysis

#### (1) Gang Evidence in Witnesses' Pretrial Statements

■ Returning to the case at hand, we begin by addressing the question of whether the circuit court properly admitted portions of the pretrial statements by Lockwood and Falcon concerning the BGF-namely, that Bam and appellant were members of the BGF and that appellant committed the murder at Bam's behest. We see no abuse of discretion on the circuit court's part in admitting the evidence. This was fact evidence demonstrating that the crime was motivated by gang affiliations. In his pretrial statement, Lockwood stated that appellant was part of the BGF. In his pretrial statement, Falcon told detectives that Bam was the "head owner for real guy," or boss, and that appellant was "a hit man for real" for Bam. Falcon told detectives that he overheard Bam say in reference to appellant, "that's my boy, straight G[uer]rilla." Falcon explained that "Guerrilla" meant "being in a gang. BGF, Black G[uer]rilla Family." When asked by Detective Min whether Bam and appellant were members of the BGF, Falcon responded "[y]es." At trial, Johnson testified, without objection, that appellant said that someone owed Bam money and that Bam had instructed appellant to kill the person. Lockwood's and Falcon's pretrial statements, coupled with

124

Johnson's testimony, constituted highly probative fact evidence establishing a motive for the offense-that Bam and appellant were BGF members, and that Bam had instructed appellant to commit the offense. As such, the evidence was clearly admissible.[10]

 We find no merit in the contention that the danger of unfair prejudice attendant to the pretrial statements of Lockwood and Falcon regarding the BGF substantially outweighed the probative value of the testimony. Before trial, concerning Lockwood and Falcon's pretrial statements, appellant's counsel argued that the danger of unfair prejudice substantially outweighed the probative value of the gang-related evidence, as he did not "really think that the [BGF] had anything to do with this shooting." As explained above, the fact evidence provided by witnesses established the motive for the shooting—that Bam, a gang leader or boss, directed appellant, a gang member described as a "hit man[,]" to murder a person who owed the boss money—and, as such, demonstrated that the offense was "gang-related." Accordingly, the fact evidence was highly probative. Under the circumstances, we are satisfied that the probative value of the fact evidence was not substantially outweighed by the danger of unfair prejudice. We perceive no abuse of discretion in the admission of the

---

**10.** At oral argument, although appellant agreed that Maryland case law does not specifically define what "gang-related" or "gang-motivated" means, appellant contended that the crime was not gang-related or gang-motivated, but rather "drug-related." Upon review of *Ayala* and *Gutierrez*, we conclude that the circumstances of gang-related or gang-motivated crimes are not confined or limited to the circumstances found in those cases. In *Ayala*, the defendant killed the victim, believing him to be a member of a rival gang. 174 Md.App. at 651–52, 923 A.2d 952. In *Gutierrez*, the defendant killed the victim for insulting his gang. 423 Md. at 482, 32 A.3d 2. As evident, the circumstances in the two cases are different, although, at the heart of each case, gang membership provided the motive for the killings. In *Ayala*, 174 Md. App. at 664, 923 A.2d 952, we stated "we establish no bright-line rule as to the admissibility of gang evidence in Maryland[.]" In this case, the circumstances—a gang member killing someone who owed the gang boss money at the behest of the gang boss—are appropriately considered "gang-related" or "gang-motivated."

gang-related information in the pretrial statements of Falcon and Lockwood.

## (2) Gang Expert Testimony

### (a) Motive

Having determined the existence of admissible fact evidence showing that the crime was related to appellant's gang membership, we address the admissibility of gang expert testimony. As we stated in *Ayala,* 174 Md.App. at 663, 923 A.2d 952, "[g]ang evidence is admissible despite the prejudice that attaches if it is relevant and particularly if it is crucial in establishing motive." (Citation omitted). Although the testimony in the instant case was not that the crime occurred as a result of rival gang conflict, this case presents circumstances no different than those in *Ayala,* in that the offense was motivated by gang affiliations. The evidence established that appellant, a member of a gang, committed the crime at the direction of a gang boss because the victim owed the gang boss money. As such, the gang expert's testimony directly explained the motive for appellant's participation in the offense. Accordingly, the circuit court properly admitted Sergeant Workley's expert testimony describing the history and structure of the gang, as the crime was "gang-related."

### (b) Recantation

After careful review of the circumstances of this case and relevant case law, we conclude Sergeant Workley's expert testimony, in addition to its relevance as to motive, was admissible to explain the witnesses' in-court recantation of the statements previously given to law enforcement authorities. We know that Maryland appellate courts have determined that expert testimony is admissible upon a showing that the crime is "gang-related" or under the exceptions to "other crimes" evidence set forth in Maryland Rule 5–404(b). As Maryland case law does not directly address whether expert testimony is admissible to explain the reasons witnesses re-

cant, at trial, information given to law enforcement officers, we turn to the persuasive case law from California and Illinois.

The case before us is similar to *Gonzalez, Tolliver,* and *Dixon* in that, in each case, witnesses repudiated pretrial identifications and statements at trial and, in each case, law enforcement officers testified as experts about gangs in which the defendants were members to explain the recantations. *Gonzalez,* 44 Cal.Rptr.3d 237, 135 P.3d at 653–54, 657; *Tolliver,* 282 Ill.Dec. 900, 807 N.E.2d at 530–34; *Dixon,* 317 Ill.Dec. 788, 882 N.E.2d at 670, 677–78. In *Gonzalez,* 44 Cal.Rptr.3d 237, 135 P.3d. at 657, the Supreme Court of California held that the expert's testimony was relevant to assist the jury in determining which version of the witnesses' testimony was credible—the initial eyewitness identification and statements identifying the defendant as the shooter, or the later repudiations of those identifications and statements. The Supreme Court of California specifically stated that "[e]vidence that a witness is afraid to testify or fears retaliation for testifying is relevant to the credibility of that witness and is therefore admissible." *Id.* (citation and internal quotation marks omitted). In *Tolliver,* 282 Ill.Dec. 900, 807 N.E.2d at 542, the Appellate Court of Illinois found that gang-related evidence was "relevant and admissible to show why several witnesses recanted their grand jury testimony against defendant, a member of the Gangster Disciples." In *Dixon,* 317 Ill.Dec. 788, 882 N.E.2d at 681, the Appellate Court of Illinois held that gang-related evidence was probative, and therefore relevant, "if it explains a witness's motive to lie about the defendant's involvement in the offense." (Citation omitted). As such, the Court determined, in *Dixon,* that the trial court properly exercised its discretion in admitting gang-related evidence to explain why the witnesses recanted and had a "change of heart at trial." *Id.*

■ Applying the principles set forth in *Gutierrez,* concerning the admission of expert testimony where an offense is gang-related, and the authorities above, we hold that expert testimony about the history, hierarchy, and common practices

of a street gang is admissible where: (1) the evidence establishes that a witness has previously given information to law enforcement officers incriminating the defendant and the witness recants the information at trial,[11] (2) the reason for the recantation is related to appellant's membership in, or affiliation with, a gang, and (3) the probative value of the expert testimony is not substantially outweighed by the danger of unfair prejudice to the defendant. Similar to the discussion of the Court of Appeals in *Gutierrez* as to the admission of expert testimony where the offense is gang-related, the critical requirement for the admission of the gang expert testimony where a witness recants is evidence showing that the recantation is related to appellant's involvement with a gang, *i.e.* "gang-related." Consistent with the holding of the Court of Appeals in *Gutierrez*, we conclude that proof of such a link "open[s] the door for expert testimony" regarding gang information. 423 Md. at 497, 32 A.3d 2.

We are satisfied that under the standard set forth in *Gutierrez* and described above, the circuit court properly exercised its discretion in admitting Sergeant Workley's expert testimony to explain the witnesses' in-court recantations. It is undisputed that the witnesses recanted at trial—*i.e.* renounced statements previously given to law enforcement officers. At trial, Lockwood testified that he could not recall his conversation on March 5, 2009, with law enforcement officers. After the State played an audio recording of the

---

11. A mere inconsistency or discrepancy between the witness's testimony in court and information previously given is not sufficient to open the door for gang expert testimony. The witness must renounce or withdraw the information previously given to law enforcement officers. According to Black's Law Dictionary, "recant" means "[t]o withdraw or renounce (prior statements or testimony) formally or publically[.]" Black's Law Dictionary 1295 (8th ed.2004). In *Jackson v. State*, 164 Md.App. 679, 691–92, 884 A.2d 694 (2005), *cert. denied*, 390 Md. 501, 889 A.2d 418 (2006), we quoted the Black's Law Dictionary definition of "recant" and explained that "[i]f the renunciation occurs formally in a courtroom, there is no doubt about the fact that a renunciation actually took place. It only remains to determine 1) the truth of the renunciation; and 2) its legal significance, if true. That is why we use the term of art 'recantation' to refer to that type of in-court renunciation."

conversation in which Lockwood identified appellant as the shooter, Lockwood testified that he did not actually see appellant shoot or "do anything." Lockwood insisted that he gave the statement to law enforcement officers because he was in a fight with appellant, and Bam told him that he wanted appellant off the street.

Likewise, Falcon recanted at trial, testifying that he lied to law enforcement officers when he told them that appellant admitted to committing the murder. After a recording of Falcon's interview was played at trial, he denied knowing that appellant admitted to the crime and reiterated that he lied to law enforcement officers.

The evidence satisfies the requirement that the recantation be related to appellant's gang involvement. The pretrial statements of two fact witnesses—Lockwood and Falcon—demonstrated that at least two of the recanting witnesses knew appellant to be a member of the BGF and feared him. In his March 5, 2009, interview, Lockwood told detectives that appellant—whom he saw shoot the victim—is a member of the BGF, and that there would be "safety issues" if he went to jail because he is not a member of the BGF. At the time of the interview, Lockwood was in custody for failure to appear, and was incarcerated prior to trial.

In his March 4, 2009, interview with detectives, Falcon stated that he heard Bam refer to appellant as "straight G[uer]rilla," which he explained meant "[l]ike being in a gang. BGF, Black G[uer]rilla Family." Falcon also told detectives that appellant was "like a hit man" for Bam and that appellant always carries a gun. Detective Min testified that he spoke with Falcon about testifying, and that Falcon said "his life would be in danger if he does [testify] and said he wasn't, he was not going to testify."

All four of the State's fact witnesses-Lockwood, Sparrow, Falcon, and Johnson—expressed fear to Detective Min during their interviews. Appellant has visible gang-related tattoos up and down each arm, and the tattoos clearly identify appellant, who was known to and seen by the witnesses, as a member of

a gang. Indeed, the purpose of such tattoos is to identify appellant as a member of the BGF. As such, in addition to Lockwood's and Falcon's specific mentions of appellant's gang affiliation and their fear, it is a reasonable inference that all of the witnesses' fear and subsequent recantations at trial resulted from appellant's gang affiliation coupled with either directly seeing appellant shoot the victim or hearing appellant admit to shooting the victim.

Appellant maintains that, even if admission of the gang-related evidence was relevant to show why witnesses recanted, "the State was still required to show that these witnesses not only knew that [appellant] was in a gang, but that it was for this reason they testified differently at trial." The evidence in the case satisfies this condition and was sufficient to open the door for gang expert testimony. Given that the witnesses who, prior to trial, either identified appellant as the shooter or stated that appellant admitted to being the shooter, all recanted the statements at trial or gave conflicting testimony, and at least two had direct knowledge of appellant's gang affiliation and expressed fear, the State adequately demonstrated that the witnesses knew appellant was in a gang and that it was for this reason they recanted at trial. Under the facts of this case, and in light of the well-reasoned analyses in *Gutierrez, Gonzalez, Tolliver, and Dixon*, we conclude that the circuit court properly determined that gang-related evidence, namely the expert testimony of Sergeant Workley, was relevant, at a minimum, to explain why appellant would act at the direction of a gang leader and why Lockwood and Falcon recanted previously given statements at trial.[12]

---

**12.** At oral argument, appellant argued that *Gonzalez* is distinguishable because, in that case, the gang expert witness testified specifically that witnesses recanted due to fear of the gang. In *Gonzalez*, the gang expert witness testified that it was "bad" to be someone who assisted law enforcement as a witness or informant, and that such people are often intimidated not to testify. 44 Cal.Rptr.3d 237, 135 P.3d at 653–54. The expert further testified that he often has to provide security and accompany the witnesses to court, and that, in one case, a witness was murdered by his own gang. *Id.*, 44 Cal.Rptr.3d 237, 135 P.3d at 657. Although it is correct that the facts of *Gonzalez* are different from

### (3) The Danger of Unfair Prejudice

■ Although the fact evidence in this case, considered in total, was sufficient to "open the door for expert testimony," as in *Gutierrez*, we must next determine whether the probative value of the evidence was substantially outweighed by the danger of unfair prejudice. 423 Md. at 497–98, 32 A.3d 2. At trial, appellant did not specifically object or argue that the danger of unfair prejudice substantially outweighed the probative value of Sergeant Workley's testimony explaining why the witnesses recanted. Notably, when arguing during Sergeant Workley's testimony that the gang-related evidence was prejudicial, appellant's counsel simply stated: "It poisons the well for the jury." Appellant's counsel failed to provide any further explanation. At the end of the bench conference on the issue, the circuit court stated that appellant's counsel objected to Sergeant Workley "being called. You objected to his expertise .... [and y]ou objected to the relevance of it." Appellant's counsel was notably silent, *i.e.* appellant's counsel did not state that the objection was also on the ground of the danger of unfair prejudice of the testimony. Following the Court of Appeals's instruction in *Gutierrez*, however—that the issue of the danger of unfair prejudice be examined—we address the matter. As this Court and the Court of Appeals expressed in *Ayala* and *Gutierrez*, respectively, we are mindful of the dangers and potential prejudice of the admission of gang-related evidence, and shall review the evidence carefully in assessing the danger of unfair prejudice.

As to the probative value, in this case, we conclude that the probative value of the testimony was high. The identity of the shooter was contested. The identification of appellant as a member of the BGF who followed the directions of another

<hr>

those in this case, in that Sergeant Workley did not describe instances of intimidation by the gang, Sergeant Workley's testimony was nonetheless relevant to explain the basis for the witnesses' fear by describing the structure and workings of the gang. We observe that Sergeant Workley's testimony was less prejudicial than the expert's in *Gonzalez*, a case in which the expert specifically testified that the gang intimidates witnesses.

gang member furnished information about the identity of the shooter and the motive for the shooting. Sergeant Workley's testimony was not duplicative of the fact witnesses' testimony, and was highly probative in identifying appellant as a member of the BGF, explaining the history and structure of the gang, and, thereby, explaining why appellant would commit a crime at Bam's—a gang boss's—direction.

Sergeant Workley's expert testimony was necessary given the circumstances of the trial—three witnesses recanted pretrial statements identifying appellant as the shooter in court and the fourth witness gave conflicting testimony. The sheer number of fact witnesses who recanted—three out of four— Lockwood, Falcon and Sparrow—as well as the contradictory testimony provided by the fourth fact witness—Johnson, increased the probative value of Sergeant Workley's testimony. Two witnesses specifically identified appellant as a member of the BGF, and that gang membership was a basis or source of the witnesses' fear. Sergeant Workley's expert testimony directly explained the turnabout of the two witnesses and inferentially explained the turnabout of all of the witnesses who saw or heard appellant admit to shooting the victim. In sum, Sergeant Workley's testimony was material to the issues of identity and motive and to providing an explanation for the witnesses' recantations, and, as such, was highly probative.

The probative value of the testimony was not substantially outweighed by the danger of unfair prejudice. Sergeant Workley's testimony was limited to: (1) discussing the history and structure of the BGF, (2) stating that the Division of Corrections classified appellant as a member of BGF and opining that appellant is a member of the BGF, and (3) reviewing photographs of appellant's tattoos. Although it is clear from the testimony that the gang is violent and the witnesses feared retaliation from it, notably, Sergeant Workley did not offer an opinion as to whether appellant actually intimidated or pressured the witnesses into recanting. Sergeant Workley did not describe or offer an opinion as to appellant's role in the gang, *i.e.* whether appellant was a leader or played some other role. Sergeant Workley also did

not testify as to specific acts of violence or crimes attributable to appellant or the BGF.

At oral argument, contending that the danger of unfair prejudice substantially outweighed the probative value of Sergeant Workley's testimony, appellant pointed to two specific items of evidence as highly prejudicial: (1) testimony concerning the Division of Corrections's classification of appellant as a member of the BGF; and (2) admission into evidence of photographs of appellant's upper torso with gang tattoos. We shall briefly address each item, as well as Sergeant Workley's testimony regarding the history and structure of the BGF and his opinion that appellant is a member of the BGF.

### (a) Testimony Concerning the Division of Corrections's Classification of Appellant and Opinion that Appellant is a Member of the BGF

The evidence concerning the Division of Corrections's classification of appellant as a member of the BGF consisted solely of testimony by Sergeant Workley, given without objection. During Detective Min's testimony, the State moved to introduce into evidence State's Exhibit No. 36, a certified copy of the Division of Corrections record identifying appellant as a member of the BGF, accompanied by a letter appellant wrote and signed "BGF 4 life[,] Guerrilla in bleed out!!" The circuit court sustained appellant's objection to introduction of the exhibit, and State's Exhibit No. 36 was not admitted into evidence. The trial exhibit log and exhibit itself indicate that the exhibit was simply marked for identification. Later, during Sergeant Workley's testimony, the State asked Sergeant Workley whether the Division of Corrections listed appellant as a member of the BGF, and Sergeant Workley simply responded, "[y]es, they have." Appellant's counsel did not object to the question or response. When asked, Sergeant Workley also testified that, in his opinion, appellant is a member of the BGF.

The danger of unfair prejudice did not substantially outweigh the probative value of Sergeant Workley's testimony on either point. Sergeant Workley's testimony as to appellant's

Division of Corrections record and classification was limited to stating that appellant is classified as a gang member. The details of appellant's past criminal record-including any specific crimes for which he was convicted or dates or periods of incarceration-were not disclosed. Indeed, as the State pointed out at oral argument, if anything, Sergeant Workley's response confirming that the Division of Corrections classifies appellant as a member of the BGF was cumulative. Appellant's counsel's failure to object specifically to Sergeant Workley's testimony on the point demonstrates the minimal prejudice attached to the testimony.

Sergeant Workley's opinion that appellant is a BGF member corroborated testimony given by Lockwood and Falcon that appellant was a member of the gang, a highly probative fact that was not conceded by appellant. As the jury had already heard testimony from other witnesses that appellant was a gang member, Sergeant Workley's confirmation of that fact was not unduly prejudicial.

### (b) Testimony Concerning Appellant's Tattoos

As to the photographs of appellant's upper torso depicting tattoos that Sergeant Workley opined were gang-related, at oral argument, appellant contended that the photographs lacked probative value because his torso was not visible unless unclothed and that admission of photographs was prejudicial. We disagree. Many of appellant's gang-related tattoos were on his arms—specifically, his forearms and biceps. Sergeant Workley's testimony regarding appellant's gang-related tattoos, as seen in the photographs, was highly probative in confirming that appellant identified himself as a gang member, a fact that was not conceded by appellant at trial. Sergeant Workley testified that a tattoo on appellant's chest, specifically the left pectoral muscle, depicted appellant's "street name" of "Sixx 9," demonstrating that appellant self-identified as "69," the person who the State's witnesses said was responsible for the shooting. Sergeant Workley's testimony regarding the "Sixx 9" tattooed on appellant's torso was directly relevant to the issue of identity as, in their pretrial

statements, Lockwood, Sparrow, and Falcon identified "69" as the shooter. Sergeant Workley testified that tattoos on appellant's right and left forearms, depicting the words "Baltimore" and "Franklin" showed that this was the area in which appellant did "business." The offense occurred in the 2500 block of West Baltimore Street. For these reasons, the probative value of Sergeant Workley's testimony concerning the nature of appellant's tattoos was not substantially outweighed by the danger of unfair prejudice.

### (c) Testimony Concerning the History and Structure of the BGF

As to Sergeant Workley's testimony concerning the general history and structure of the BGF, we conclude that the circuit court did not err in permitting the testimony as the probative value of the testimony was not substantially outweighed by the danger of unfair prejudice. At trial, Sergeant Workley testified that the BGF is a prominent prison gang in Maryland that controls most of the jails within the State, as well as the narcotic trade inside of the jails. Sergeant Workley's testimony was highly probative in explaining Lockwood's recantation. During Lockwood's interview with law enforcement officers, Lockwood told detectives that the BGF is in the jails and that, as he was not a member of the gang, there would be "safety issues" if he went to jail. At trial, Detective Min testified that, at the time Lockwood gave the interview, Lockwood was under arrest pursuant to an open warrant for failure to appear for a drug charge, and that Lockwood was sent to Central Booking immediately after the interview as a result of the open warrant. Sergeant Workley's testimony assisted the jury with understanding why Lockwood, who was facing imminent incarceration, would be afraid to give testimony implicating appellant as the shooter in a murder case, and explained the reason for Lockwood's recantation.

As to Sergeant Workley's testimony that the BGF controlled the drug trade within the jails, as the Court of Appeals stated in *Gutierrez,* when assessing expert testimony regarding the violent nature of a gang, "we do not see how [appel-

lant] was unfairly prejudiced by this piece of evidence[.]" *Gutierrez*, 423 Md. at 499, 32 A.3d 2. The testimony concerning the BGF's presence in "the jails" was highly probative in explaining Lockwood's recantation. The brief mention by Sergeant Workley that the BGF controlled the drug trade within the jails was not unfairly prejudicial as Sergeant Workley did not elaborate on the point or provide an opinion that appellant was involved with the drug trade within the jails.

As to the structure and organization of the BGF, Sergeant Workley testified that the BGF is structured and run like a business, and that the gang ranks its members. This testimony was highly probative in corroborating earlier testimony from Falcon and Johnson, in which the witnesses described appellant as a "hit man" who took direction from Bam, a gang boss, and who was ordered by Bam to shoot the victim. Sergeant Workley's testimony clarified that the position of "hit man" exists within the gang, and explained why appellant, a gang member, would act at the behest of a gang boss—namely, that in the BGF, there is a leader, a rank structure, and rules that must be followed or else "there's consequences[.]"

### (d) Conclusion

In this case, given that fact evidence established that appellant committed the offense at the instruction of another gang member, two of the witnesses indicated appellant was a member of the gang, and the number of recanting and contradictory witnesses was high, the probative value of Sergeant Workley's testimony was heightened "such that it was not outweighed by any unfair prejudice." *Gutierrez*, 423 Md. at 498, 32 A.3d 2. Although appellant contends that the jury did not need expert testimony to "understand that it is reasonable for a citizen to fear a gang member[,]" Sergeant Workley's testimony was crucial in describing the history, structure, and practices of the gang—the BGF—and thereby explaining why appellant would act at a gang leader's request and explaining the basis for the witnesses' fear. The danger of unfair prejudice was lessened by the expert not offering an

opinion on appellant's role in the gang, or crimes attributable to him or the gang. For all of the reasons above, we discern no abuse of discretion on the part of the circuit court in admitting Sergeant Workley's testimony.[13]

## II.

### "CSI–Type" *Voir Dire* Question

Appellant contends that the circuit court abused its discretion by asking a "CSI-type" question during *voir dire*. Appellant argues that the question "serve[d] no purpose other than to undermine [his] right to a fair trial." Appellant acknowledges that his counsel failed to object to the *voir dire* question, but urges this Court to exercise plain error review.

The State responds that plain error review is inappropriate in this case. Alternatively, the State contends that the circuit court properly exercised its discretion in posing a "CSI-type" question during *voir dire*. The State argues that the question was not unduly suggestive of appellant's guilt and was a "content-neutral" inquiry into whether a juror "would set an artificial standard" for evaluation of the evidence.

██ It is well settled that a trial court's rulings as to *voir dire* are reviewed under an abuse of discretion standard.

---

**13.** To the extent that appellant's membership in a gang may be viewed as "other crimes" evidence, we are satisfied that the evidence regarding appellant's BGF gang membership met the requirements for admission under Maryland Rule 5–404(b)–the evidence met at least one of the special exceptions for admissibility and was established by clear and convincing evidence. *See Solomon v. State*, 101 Md.App. 331, 338–39, 646 A.2d 1064 (1994), *cert. denied*, 337 Md. 90, 651 A.2d 855 (1995) (Pursuant to Maryland Rule 5–404(b), the trial court must determine "whether the evidence fits within a legitimate exception" and "needs to be persuaded, by the clear and convincing standard, that the alleged crime did, indeed, take place before [the trial court] allows evidence of it to come into evidence."). In this case, the evidence was relevant to identity and motive. Appellant's membership in the gang was established by clear and convincing evidence—via the testimony of people who knew him and by the tattoos he displayed. And as discussed above, the probative value of the evidence was not outweighed by the danger of unfair prejudice.

*State v. Logan,* 394 Md. 378, 396–97, 906 A.2d 374 (2006). The Court of Appeals has stated:

> The scope of voir dire and the form of questions propounded rest firmly within the discretion of the trial judge. Accordingly, it is the responsibility of the trial judge to conduct an adequate voir dire to eliminate prospective jurors from the venire who will be unable to perform their duty fairly and impartially. To that end, the trial judge should focus questions upon "issues particular to the defendant's case so that biases directly related to the crime, the witnesses, or the defendant may be uncovered." On appellate review, because the trial judge has had the opportunity to hear and observe the prospective jurors, we pay substantial deference to the judge's conclusions, unless they are the product of a "voir dire that is cursory, rushed, and unduly limited." We review the trial judge's rulings on the record of the voir dire process as a whole to determine whether the trial judge abused his or her discretion.

*Id.* at 396, 906 A.2d 374 (citations omitted).

In *Charles and Drake v. State,* 414 Md. 726, 739, 997 A.2d 154 (2010), the Court of Appeals held that the trial court "abused [its] discretion by suggesting to the [jury] panel that convict[ing] Drake and Charles was the only option in the present case; this suggestive question poisoned the venire, thereby depriving Drake and Charles of a fair and impartial jury." (Citation omitted). In *Charles and Drake,* over the defendants' objection, the trial court asked the prospective jurors the following during *voir dire:*

> I'm going to assume that many of you, from having done a few of these, watch way too much TV, including the so-called realistic crime shows like CSI and Law and Order. I trust that you understand that these crime shows are fiction and fantasy and are done for dramatic effect and for this dramatic effect they purport to rely upon, "scientific evidence," to convict guilty persons. While this is certainly acceptable as entertainment you must not allow this entertainment experience to interfere with your duties as a juror. Therefore, if you are currently of the opinion or belief that

you cannot convict a defendant without "scientific evidence," regardless of the other evidence in the case and regardless of the instructions that I will give you as to the law, please rise[.]

414 Md. at 730, 997 A.2d 154 (footnote omitted). The Court of Appeals determined that "[t]he language of the *voir dire* question ... was not neutral, using the term 'convict,' solely, rather than including its alternative." *Id.* at 738, 997 A.2d 154. The Court stated that: "[W]hether a *voir dire* inquiry related to the purported 'CSI effect' is appropriate at a theoretical level, we leave to another day. The issue before us is really the appropriateness of the language used in the inquiry." *Id.* at 733, 997 A.2d 154 (footnote omitted).

In *McFadden and Miles v. State,* 197 Md.App. 238, 254, 13 A.3d 68 (2011), we held that the trial court abused its discretion in asking a CSI question "nearly identical" to the one struck down in *Charles and Drake:*

I'm going to assume, based on having done this before, that many of you watch way too much television, including the so-called realistic crime shows, like CSI, Miami, and CSI, New York, and CSI, Glen Burnie, Law and Order, and Illegal and Unwarranted and the rest of them.

Now, I trust you understand that these crime shows are fiction and fantasy. And for dramatic effect and for you to stay tuned in, they purport to rely upon "scientific evidence." This is certainly entertainment, but you must not allow that entertainment to interfere with the high duty you will have in this case as a juror.

Therefore, if you are currently of the opinion or belief that you cannot convict a Defendant without "scientific evidence," regardless of the other evidence in the case and regardless of the instruction I give you as to law, please rise. I see no responses. Okay.

*McFadden and Miles,* 197 Md.App. at 250–51, 13 A.3d 68. In *McFadden and Miles,* the defendants objected to the CSI question after the *voir dire* question was posed to the jury. *Id.* at 250, 13 A.3d 68.

In *State v. Stringfellow*, 425 Md. 461, 466, 42 A.3d 27 (2012), the trial court asked the following CSI *voir dire* question over the defendant's objection: "Does any member of the panel believe that the State is required to utilize specific investigative or scientific techniques such as fingerprint examination in order for the defendant to be found guilty beyond a reasonable doubt?" No juror responded to the question and, after completion of *voir dire* and jury selection, the defendant accepted the jury panel without objection, affirmatively responding that the jury panel was acceptable. 425 Md. at 466–67, 42 A.3d 27. On review, the Court of Appeals held:

> We conclude that, given the nature and objective of Stringfellow's objection to the voir dire question, he failed to preserve for appellate review the grounds of the objection when he accepted the empaneled jury, without qualification or reservation. Even had Stringfellow preserved his objection, and assuming that propounding the pre-emptive "anti-CSI effect" question was error, the error was harmless beyond a reasonable doubt, given the record of his trial.

425 Md. at 469, 42 A.3d 27 .

In *Morris v. State*, 204 Md.App. 487, 42 A.3d 83 (2012), this Court recently stated:

> Preliminarily, the State argues that appellant did not preserve this issue for our review because, though he objected to the State's proposed *voir dire* question, appellant did not take exception to the question at issue when asked by the circuit court after *voir dire* and later accepted the jury as empaneled. As mentioned, the Court of Appeals recently ruled that a court's asking of the "CSI" question during *voir dire* goes to the composition of the jury. *Stringfellow*, 425 Md. at 469–73, 42 A.3d 27. Therefore, by accepting the jury as empaneled, appellant waived his argument now on appeal. Nevertheless, as discussed *infra*, appellant's argument, though waived, is without merit.

*Morris*, 204 Md.App. at 493, n. 1, 42 A.3d 83.

In *State v. Rich*, 415 Md. 567, 578, 3 A.3d 1210 (2010), the Court of Appeals laid out the test for plain error review as follows:

[P]lain-error review—involves four steps, or prongs. First, there must be an error or defect—some sort of [d]eviation from a legal rule—that has not been intentionally relinquished or abandoned, i.e., affirmatively waived, by the appellant. Second, the legal error must be clear or obvious, rather than subject to reasonable dispute. Third, the error must have affected the appellant's substantial rights, which in the ordinary case means he must demonstrate that it affected the outcome of the district court proceedings. Fourth and finally, if the above three prongs are satisfied, the court of appeals has the discretion to remedy the error—discretion which ought to be exercised only if the error seriously affect[s] the fairness, integrity or public reputation of judicial proceedings. Meeting all four prongs is difficult, as it should be.

(Quoting *Puckett v. United States*, 556 U.S. 129, 135, 129 S.Ct. 1423, 173 L.Ed.2d 266 (2009)) (citations and internal quotation marks omitted).

Plain error review is extraordinary so as to encourage trial counsel to preserve the record. "If every material (prejudicial) error were *ipso facto* entitled to notice under the 'plain error doctrine,' the preservation requirement would be rendered utterly meaningless." *Morris and Everett v. State*, 153 Md.App. 480, 511, 837 A.2d 248 (2003), *cert. denied*, 380 Md. 618, 846 A.2d 402 (2004). "[T]he fact that a material error has resulted in prejudice to the accused does not *ipso facto* call for the appellate court to entertain the contention notwithstanding its non-preservation." *Austin v. State*, 90 Md.App. 254, 264, 600 A.2d 1142 (1992) (quoting *Sine v. State*, 40 Md.App. 628, 632, 394 A.2d 1206 (1978)). Because it is so extraordinary, "the 'plain error doctrine' 1) always has been, 2) still is, and 3) will continue to be a rare, rare phenomenon." *Morris and Everett*, 153 Md.App. at 507, 837 A.2d 248.

In this case, as a threshold matter, it is undisputed that the matter is not preserved for review. Appellant failed to object to the "CSI-type" *voir dire* question and affirmatively accept-

ed the impaneled jury. *See Stringfellow,* 425 Md. at 468–70, 42 A.3d 27; *Morris,* 204 Md.App. at 493, n. 2, 42 A.3d 83.

█ We find no merit in appellant's contention that plain error review is warranted. The *voir dire* question with which appellant takes issue is a content-neutral inquiry into the standard with which jurors would review evidence. As such, there is no support for a conclusion that there was any error or deviation from a legal rule that had not been intentionally relinquished or abandoned-the first prong under *Rich,* 415 Md. at 578, 3 A.3d 1210. In this case, the circuit court asked:

> The jurors will be called upon to consider all of the evidence that is presented no matter who it is presented by. No matter what the person, the party is urging you to consider. Is there any member of the jury panel who would require trace evidence in order to accept a proposition presented by one of the parties? In other words, you say well, she didn't present this or he didn't present that.

The circuit court asked a reasonable question regarding scientific evidence—*i.e.*, whether the jury would require trace evidence to accept positions presented by one of the parties. There was no error, plain or otherwise.[14]

---

**14.** Appellant's reliance on *Stabb v. State,* 423 Md. 454, 31 A.3d 922 (2011) is misplaced. In *Stabb,* 423 Md. at 456–57, 31 A.3d 922 the Court of Appeals reviewed the "propriety of an 'anti-CSI effect,' or 'no duty,' jury instruction, given before closing arguments in a criminal trial, that instructed the jury there is 'no legal requirement that the State utilize any specific investigative technique or scientific test to prove its case.'" The Court concluded that the trial court abused its discretion by preemptively giving the jury instruction before closing argument. *Id.* at 471, 31 A.3d 922. The Court observed that, "[i]n closing, although defense counsel commented on the lack of physical evidence, the overwhelming majority of her argument focused on the State's reliance on a single child witness, conflicting statements of the State's other witnesses, motive ... to influence [the child's] statement, [defendant's] alibi, and possibility of an alternative assailant." *Id.* at 470–71, 31 A.3d 922. In contrast, in this case, we are presented with a unobjected to *voir dire* question asked of **potential** jurors, which did not suggest that a lack of scientific evidence could not be considered or that one result was favored over the other. Indeed, in this case, in asking the question, the circuit court stated: "The jurors will be called upon to consider all of the evidence that is presented no matter who it is

Demonstrating further appellant's failure to satisfy the conditions necessary for plain error review is that, to the extent appellant alleges the circuit court abused its discretion in asking the *voir dire* question, there is no contention that the error was clear or obvious. A review of the record shows that appellant's counsel not only failed to object to the *voir dire* question at any point, but counsel also accepted the impaneled jury without objection or qualification. The failure to object supports the conclusion that appellant failed to satisfy the second prong of plain error review under *Rich*—that the alleged legal error must be clear or obvious, rather than subject to reasonable dispute.

## III.

### Jailhouse Telephone Call

Appellant contends that the circuit court erred by admitting into evidence a telephone call he made from the Baltimore City Detention Center to an unidentified woman inquiring into the whereabouts of Lockwood. Appellant argues that the content of the telephone call was irrelevant, ambiguous, and lacking in probative value, and therefore inadmissible at trial. Appellant asserts that as the substance of the telephone call was ambiguous, the call "made it no more or less probable" that appellant was attempting to find Lockwood to intimidate him rather than to discuss some other matter with Lockwood. Appellant maintains that the telephone call was not evidence of consciousness of guilt, and lacked probative value.

The State contends that the circuit court properly exercised its discretion in admitting the call because the call was probative of "whether Lockwood's stated fear of [appellant] was reasonable[.]" The State argues that even if the purpose of the call was susceptible to more than one interpretation, "[a]ny ambiguity in the purpose of the call went to its weight not its admissibility." The State maintains that any complaint

———

presented by. No matter what the person, the party is urging you to consider."

that the probative value of the jailhouse telephone call was substantially outweighed by the danger of unfair prejudice is not an issue preserved for appellate review, as the issue was not raised in the circuit court.

In *State v. Simms*, 420 Md. 705, 724–25, 25 A.3d 144 (2011), the Court of Appeals outlined the applicable standard of review for admissibility of evidence as follows:

In *Ruffin Hotel Corp. of Md. v. Gasper*, 418 Md. 594, 17 A.3d 676 (2011), we explained the standards by which we review the admission, or exclusion, of evidence, stating:

It is frequently stated that the issue of whether a particular item of evidence should be admitted or excluded is committed to the considerable and sound discretion of the trial court, and that the abuse of discretion standard of review is applicable to the trial court's determination of relevancy. Maryland Rule 5–402, however, makes it clear that the trial court does not have discretion to admit irrelevant evidence.... [T]he de novo standard of review is applicable to the trial judge's conclusion of law that the evidence at issue is or is not of consequence to the determination of the action.

*Ruffin*, 418 Md. at 619–620, 17 A.3d at 691. Thus, we must consider first, whether the evidence is legally relevant, and, if relevant, then whether the evidence is inadmissible because its probative value is outweighed by the danger of unfair prejudice, or other countervailing concerns as outlined in Maryland Rule 5–403. During the first consideration, we test for legal error, while the second consideration requires review of the trial judge's discretionary weighing and is thus tested for abuse of that discretion. *See J.L. Matthews, Inc. v. Maryland–National Capital Park and Planning Com'n*, 368 Md. 71, 92, 792 A.2d 288, 300, n. 18 (2002) ("Although at first glance such a determination may appear to be a legal conclusion, at its core it is based on a trial judge's independent weighing of the probative value of the evidence against its

harmful effects. As such, it is subject to the abuse of discretion standard.").

(Some citations and internal quotation marks omitted).

In *Klauenberg v. State,* 355 Md. 528, 541, 735 A.2d 1061 (1999), the Court of Appeals discussed which issues are preserved for appellate review when specific grounds are offered for an objection, stating: "It is well-settled that when specific grounds are given at trial for an objection, the party objecting will be held to those grounds and ordinarily waives any grounds not specified that are later raised on appeal."

In this case, the State offered the recorded jailhouse call into evidence, arguing that the call was relevant because it demonstrated that appellant sought to contact Lockwood to influence him into changing his statement to detectives or to prevent him from testifying. With certainty, the telephone call made on October 5, 2009, by appellant to Lockwood's girlfriend searching for Lockwood tended to make the State's theory that appellant sought to influence Lockwood into changing his account more probable than it would have been without the recording. The existence of the telephone call established a critical link—that appellant attempted to locate Lockwood prior to trial. Under Maryland Rule 5–401,[15] the phone call was relevant to the proceedings at trial.

As to the State's contention that any issue as to the danger of unfair prejudice is not preserved for review, we agree. At trial, appellant's counsel objected when the State sought to play the recorded telephone call for the jury. The circuit court asked for the basis of the objection, and appellant's counsel responded, "I'm going to object based, you know, based on what's the relevance of that tape to this proceeding." As such, it is evident that appellant's counsel offered a specific ground for his objection—relevance—to the

---

15. Maryland Rule 5–401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

playing of the telephone call recording and did not offer any other or additional reasons for the objection. Accordingly, we need not address whether the probative value of the recording was substantially outweighed by the danger of unfair prejudice as appellant has failed to preserve the issue. *See Klauenberg*, 355 Md. at 528, 735 A.2d 1061.

Nonetheless, we conclude that the circuit court properly exercised its discretion in admitting the recording of the call. The call contained no inflammatory or prejudicial information. The circuit court observed, in denying appellant's motion to exclude the call prior to trial, that the call was "open to the interpretation the State's presenting or it's open to the interpretation that means absolutely nothing. That's the art of arguing what the evidence is[.]" Thus, appellant had the opportunity at trial to argue that the call was innocuous despite the State's interpretation. As such, we perceive no merit in the contention that the danger of unfair prejudice substantially outweighed the probative value of the call.

**JUDGMENTS OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**